IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| G.A. by his parents and Next Friends, | ) | |
| Stephen and Emily ARFF, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.: |
| v. | ) | |
| | ) | |
| SPECIAL SCHOOL DISTRICT | ) | |
| OF ST. LOUIS COUNTY | ) | |
| ROCKWOOD R-VI SCHOOL DISTRICT, | ) | |
| DR. MOLLIE BOLTON, DR. LORINDA KREY | ) | |
| ELLEN KENKEL, and BRANDI BUFFINGTON | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# **COMPLAINT**

## I.    **INTRODUCTION**

G.A. is a child with an above-average IQ who came to school every day ready to work, giving full effort despite never moving forward an inch in his reading or writing skills. The absence of progress slowly broke him emotionally and mentally, leaving his parents with no choice but to remove him from public school after third grade and place him at Churchill, a school designed for students with dyslexia.

By the end of third grade, his educators (Defendants) had still not taught him to accurately read basic words such as cat, dog, or pig, even as he continued to score above the 90th percentile on nationally normed math assessments. Yet, when Defendants were challenged, the Administrative Hearing Commission concluded, contrary to all available evidence, that GA's profound reading deficits were "unfortunate" but reflected his lack of

"capacity" to learn to read rather than a failure to provide him an appropriate education. In doing so, the Commission inverted the holding of recent Supreme Court precedence, treating the Districts' repetition of the same word reading goal for multiple years not as evidence of their failure, but as proof that the goal was "challenging" merely because G.A. never achieved it.

Despite the Commission accepting the Districts' bold-face assertion that they did not "sit idly by" while G.A. failed to progress, the record shows otherwise. For his entire second-grade year, G.A. was assigned a brand-new special education teacher with no literacy training, no literacy curriculum, and no research-based programming or meaningful data collection, deficiencies that so alarmed Rockwood staff, they documented their concerns. The following year, the Districts assigned G.A. to a teacher with no experience delivering the Wilson Reading System (after correctly determining that it was an effective intervention), who systematically gutted the program's research-based structure: she ignored mastery standards, advanced him without demonstrated skill acquisition, and provided no lessons with fidelity for the entire year. Why did the Districts do this? They were motivated by avoiding the cost and trouble of providing the special education services they were mandated and exist to provide.

And the loss was the child's. G.A. made no meaningful progress in reading or writing, which was not from an inherent lack of "capacity" to learn to read or write by an intelligent, disabled child. Rather, the Districts failed to meet their legal and moral obligations to provide all students—including G.A.—with special education services that are reasonably calculated to enable him to make progress. Treating the severity of G.A.'s disabilities as a justification for stagnation contravenes the law's express purposes: to provide individualized, effective instruction grounded in high expectations so that children with disabilities can make meaningful progress and are prepared for further education, employment, and independent living.

Rather than provide G.A. with educational services, Defendants withheld critical data, misrepresented G.A.'s progress in formal and informal reporting, coordinated to restrict staff communication with his mother, and treated his disability as a reason to lower expectations and to regard grade level attainment as unattainable rather than as a reason to intensify services, subjecting him to direct disability discrimination, and violating his and his Parents' civil rights while under the color of state law. By attributing his lack of progress to an alleged lack of capacity rather than to their own failures, and by treating him differently from nondisabled peers in the design and implementation of his instruction, the Districts and their officials discriminated against him on the basis of disability and denied him equal protection and due process.

## II.    <u>PARTIES</u>

1.      Plaintiff G.A. is a minor child attending secondary school at Rockwood School District. G.A. is a child with a disability who, by reason thereof, needs special education and related services. G.A. is a resident of St. Louis County, Missouri.

2.      Plaintiff G.A.'s parents, Stephen Arff (Father) and Emily Arff (Mother) (collectively, Parents), are residents of St. Louis County and active participants in G.A.'s education and rearing.

3.      Defendant Rockwood School District (RSD) provides G.A. general education and teaches a general curriculum, including skills such as reading, writing, and math. Defendant RSD's principal place of business is in St. Louis County, State of Missouri, and subject to Federal and state law and regulations, including by the U.S. Department of Education.

4.      Defendant Special School District of St. Louis County is responsible for providing G.A. special education services. Defendant SSD's principal place of business is in St. Louis

County, State of Missouri, and subject to Federal and state law and regulations, including by the U.S. Department of Education.

5.      Defendant Dr. Mollie Bolton is SSD's chief of teaching, learning and accountability. At all relevant times, her duties included serving as SSD's coordinator of curriculum and instruction. She also worked as an SSD literacy coach, a reading specialist in the Ritenour School District and an SSD special education teacher. Her principal place of business is at SSD in Saint Louis County, Missouri.

6.      Defendant Ellen Kenkel is the Special Education Coordinator for Rockwood school district. She is employed by SSD and placed by SSD in Rockwood. Her principal place of business is at Rockwood in Saint Louis County, Missouri.

7.      Defendant Dr. Lorinda Krey is Rockwood elementary school principal at Fairway Elementary. Her principal place of business is at Rockwood in Saint Louis County, Missouri.

8.      Defendant Brandi Buffington is employed by SSD as the School Psychologist for Fairway Elementary. Her principal place of business is at Rockwood in Saint Louis County, Missouri.

### III.    JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 20 U.S.C. § 1415(i)(2)(A) of the Individuals with Disabilities Education Act (IDEA), 29 U.S.C. § 794(a), 42 U.S.C. §§ 12131-12165, and 28 U.S.C. § 1331. It has supplemental jurisdiction over related state claims pursuant to 28 U.S. Code § 1367(a).

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that all parties reside or conduct business in this district and all events described in this Complaint occurred within the Eastern District of Missouri. Declaratory relief is authorized by 28 U.S.C. §§ 2201,

2202.

11.     On May 14, 2025, Plaintiff filed a Due Process Petition before the Missouri Administrative Hearing Commission, exhausting administrative remedies.

## IV.    STATEMENT OF FACTS

### A.    Background: 2018-2022

12.     G.A was identified early as a three-year-old child with a speech delay. His preschool teacher noted concerns with intelligibility. Testing showed early indicators of difficulty with phonological awareness.

13.     G.A. was found eligible for services by SSD under Speech Impairment- Sound System Disorder. An Individualized Education Plan (IEP) was drafted in November 2019. Eligibility for services was removed a few months later, in January of 2020.

14.     In Kindergarten, G.A. took the STAR Early Literacy test in Fall/Winter/Spring and scored 82%, 96% and 92% respectively. The test does not require him to read but tests literacy-related skills. By midyear, G.A.'s lack of progress in reading flagged him for intervention. At the same time, he was also referred for testing for the gifted program. His Full Scale IQ (FSIQ) of 121 placed him in the 92% nationally.

### B.    First Grade 2022-2023

15.     By first grade, both teachers and parents became concerned with his lack of progress in reading and writing, despite interventions in kindergarten.

16.     An August 31, 2022, STAR reading assessment placed G.A. at 2%, reading below first grade level and 2.00 grade levels behind his peers. His Student Growth Percentile (SGP) was 9%. Average SGP is 50% and anything below 35% is considered below average and in need of intervention.

17.    In contrast, G.A.'s STAR math score was in the 97%.

18.    On September 9, 2022, Parents were notified G.A. again qualified for support from Rockwood Reading Intervention teachers for First grade. Teacher comments on his report card at the conclusion of the first term indicated he still struggled to decode CVCe words (hike, bake, etc.) and words that contained the letters 'b' and 'd'. He could not read first-grade text fluently. His writing also showed reversals and the inability to spell and/or copy correctly.

19.    A January 10, 2023, STAR reading assessment placed G.A. at 1% and 2.43 grade levels behind his peers. His Reading Domain score showed he had only mastered 1% of the content for the year.

20.    In contrast, G.A.'s STAR math assessment was in the 87%.

21.    On January 20, 2023, Rockwood developed a Reading Success Plan (RSP) pursuant to Missouri state guidance. G.A. was not receiving special education services at this time. Reading interventionists reported he struggled to identify letters and sounds, blend three-letter words, and wrote backwards. Internally, Rockwood staff expressed significant concerns about his lack of progress.

22.    In February 2023, G.A. was referred to SSD for a special education evaluation for concerns in both reading and written expression. By this point, G.A. had already been in Rockwood's Reading Interventions for more than a year with no measurable growth.

23.    The referral form noted that G.A. was below expected achievement in both reading and written expression. G.A. was reading on Level B; an early kindergarten expectation. Peers were reading on Level G/H with an end-of-year expectation of Level J.

24.    His teacher informed the team that he struggled to decode, and his reading comprehension was based on his ability to take clues from the pictures. In math, he needed help with reading word problems. The teacher could not read his writing and noted that his

6

words often omitted a vowel sound.

25.    SSD agreed to evaluate G.A. in March 2023 for suspected Specific Learning Disabilities in reading and writing.

26.    The April 11, 2023 STAR reading assessment placed G.A. at 1%, 2.73 grade levels behind his peers. He had mastered none of the Reading Domains for the year and remained at 1% mastery for the content.

27.    In contrast, G.A.'s STAR math assessment was 99%.

C.    **Initial Evaluation May 2023**

28.    The evaluation was completed, and the team met in May of 2023, the end of his first-grade year. The meeting was led by SSD school psychologist Brandi Buffington, who presented a slideshow on her whiteboard. The slideshow was prepared in advance of the meeting. Mother recalled that the team only discussed basic reading eligibility. Mother was not offered eligibility for services in any other areas, including Specific Learning Disabilities (SLD) in written expression, reading fluency, or reading comprehension. No testing was done by SSD in the areas of speech or language. During the meeting, Mother expressed concerns with G.A.'s writing legibility and was told that an occupational therapist (OT) would test his handwriting at the start of the next school year.

29.    On SSD's testing, G.A.'s FSIQ was 117, at 87%. He scored 132 on the Visual Spatial Index, in the extremely high range. Due to the discrepancy with his Working Memory, a General Ability Index was calculated at 125, in the 95% and in the very high range.

30.    Achievement testing was also conducted and showed significant areas of discrepancy. Buffington utilized the Kaufman Test of Educational Achievement, Third Edition (KTEA-3). G.A. could not produce rhyming words and struggled to decode both real and nonsense words, including simple words like 'on' and 'be'. Buffington skipped numerous

7

subtests in the evaluation.

31.    Buffington found that G.A. struggled with word reversals and vowel sounds. She opined that his inability to decode impacted his ability to answer comprehension questions. Buffington noted that he struggled to spell and his written expression skills fell in the below-average range, and described his writing as "indecipherable" and replete with letter reversals.

32.    In the Tests of Achievement Assessment, Buffington only gave him the Letter-Word Identification assessment and the Word Attack. She did not give him the majority of the subtests on that assessment.

33.    The PowerPoint presentation for the meeting formed the basis of the discussion. Buffington noted in the PowerPoint that G.A. had some difficulty with visual tracking and visual discrimination, and he inadvertently skipped lines and made symbols the wrong way. She noted that these things may impact his working memory and stated: "If it becomes more of an issue, there are vision therapists." None of these observations or her recommendations for possible future vision therapy appeared in her evaluation report or in any other SSD document.

34.    Buffington failed to do sufficient testing to calculate composite scores in reading fluency or reading comprehension, each of which is a separate area of eligibility under IDEA. Buffington's PowerPoint misinformed the team that G.A. had obtained a standard score (SS) of 86 in silent reading fluency, equivalent to the 18%, when in fact he had scored a SS of 74 in the 4%.

35.    Additionally, although a written expression composite was calculated (SS 67 in the 1%), the score met the discrepancy requirements for eligibility, and Buffington acknowledged that academic impact existed, she failed to include the score on the PowerPoint for the Parents or team to consider. This was G.A.'s lowest composite in all areas tested. During writing observations in both the classroom and during testing, she noted that he was unable to

produce decipherable writing. Buffington was aware that Written Expression was its own area of eligibility, but failed to make a recommendation for eligibility or even open the topic for discussion.

36.    Rather, Buffington informed the team that G.A.'s reading comprehension and writing were impacted by poor decoding skills and declared the scores not to be valid measures of G.A.'s skills.

37.    Buffington's slides highlighted only the option for "Basic Reading Skills" for eligibility. She only provided discrepant scores for Basic reading, failing to include them for reading comprehension, reading fluency, and written expression on the slides. At the end of the meeting, G.A. was found eligible only in the area Buffington had highlighted before the meeting —Basic Reading. Buffington predetermined the eligibility area.

38.    During the meeting, there was a discussion about the need for OT testing. Buffington failed to document this discussion or the referral in the evaluation report. G.A. was not, and has never been, formally referred or evaluated for the visual perception concerns Buffington first noted in first grade.

39.    Buffington's Evaluation Report lacked scores for the majority of the achievement tests in the body of the report. It did not contain a discussion of SLD Written Expression, Reading Fluency, or Reading Comprehension.  The report did not include the concerns related to his vision or OT. The information in the evaluation report, including test scores, differed from that presented in the PowerPoint slides the team relied on to make eligibility determinations. Buffington's determination to only qualify G.A. in the limited area of eligibility for SLD in Basic Reading, directly impacted all future services and goals in his IEPs.

### D.    <u>Initial IEP May 2023</u>

40.     An initial IEP was generated on May 22, 2023. The Present Levels of Academic Achievement and Functional Performance (PLAAFP), generated from Buffington's Evaluation report, stated that his disability impacted his performance in the general education setting in the following way: blend sounds together to decode unfamiliar words. No other impact was noted. To access the general education curriculum, it was stated that G.A. would need to participate in small-group explicit instruction in the area of Basic Reading.

41.     The IEP failed to include information on his testing data related to his deficits in written expression, spelling, reading comprehension, or reading fluency. No reference was made to concerns about writing or spelling, or to the fact that the initial referral was for both reading and writing. By failing to capture these deficits, the IEP presents levels did not provide an accurate picture of G.A.'s academic functioning and prevented the team from developing goals in these identified areas of need.

42.     A Fastbridge CBMR fluency assessment noted him reading 10 correct words per minute (cwpm) with only 56% accuracy in Winter 2022 and 10 cwpm with only 45% accuracy in Spring 2023

43.     Two goals were set for G.A. at the IEP meeting.

   a.   "By May 20, 2024, when given a list of 20 words with grade appropriate letter patterns CVC, CCVC, CVCC and CVCE words (e.g., can, trim, pond, hope), G.A. will increase his basic reading skills by identifying each sound in the word and blend the sounds together to correctly read the word aloud, for 15 out of 20 words as measured by progress monitoring probes and oral reading samples." His baseline was 4. *Id.* at 1215.

   b.   "By May 20, 2024 when given a list of with 30 priority, high-frequency words, G.A. will increase his basic reading skills by correctly reading the words aloud with fluency, for 20 out of 30 words as measured by progress monitoring samples and reading records." Baseline 10. *Id.*

44.     The SSD team proposed a total of 90 minutes per week to address his significant

reading deficits. Despite the late-in-the-year IEP meeting and his significant deficits, SSD declared they would not consider Extended School Year (ESY) services until after January 31, 2024, mid-second grade.

45.    Because both SSD and Fairway failed to disclose internal intervention data, presented false data at the eligibility meeting, and the teachers and interventionists did not share their serious concerns with the nature and severity of G.A.'s learning disability, Mother's ability to participate in the meetings was impacted.

### E.    **Second Grade 2023-2024**

Reading Intervention

46.    G.A. was assigned to Rockwood reading intervention again in second grade in addition to his special education services. G.A. struggled with learning phonemes and applying phonemes and phonics skills to decode words, which included an inability to segment sounds and blend them together. The Rockwood intervention teacher did not have any special education certifications.

47.    G.A.'s second-grade teacher was only in her second year of teaching. She noted that when he came into her classroom, he could not read a science or social studies book, and he was unable to read grade-level text or assignments. He was placed in her lowest reading group. She also had concerns with G.A.'s writing, including letter formation and spelling. She noticed he lacked phonetic awareness: he missed sounds in words or misrepresented them to spell, and he had letter reversals.

48.    G.A.'s STAR report in August 2023 placed his reading percentile as 1% and his "growth" at 9%. He started second grade at 3.01 grade levels below expectations. His scores were stagnant from September 2022 through August 2023.

49.    Despite the severity of his deficits, G.A. was assigned to a first-year special

education teacher with no literacy training. Kayla Meyer had no research-based literacy programs in her classroom. The Rockwood interventionist testified that G.A. was not receiving a research-based intervention through SSD because the teachers lacked training. Despite requests for G.A.'s entire educational file, SSD did not produce any evidence of the literacy programming provided to G.A. during his second-grade year by SSD. The testimony of all witnesses that worked with G.A. during second grade indicated Meyer lacked appropriate programming, failed to share any literacy data, and failed to attend the weekly Multitiered Systems of Support (MTSS) meetings where the team regularly discussed G.A.'s lack of progress. Rockwood staff testified they repeatedly expressed concerns during internal meetings and discussions that SSD was not providing appropriate services to G.A. and that, as a result, he was not progressing. Rockwood staff also expressed concerns that SSD was not providing adequate service minutes to meet his needs.

50.    SSD Area Coordinator Ellen Kenkel was Meyer's supervisor. Kenkel failed to review service logs for Meyer to ensure she was providing G.A. with the minutes he was entitled to under his IEP. Kenkel did not recall observing any reading lessons with G.A. Kenkel could only testify to the types of materials available to Meyers to use, not what she actually used. Kenkel was aware that Meyers was a first-year teacher, and the Rockwood staff were expressing concerns about G.A.'s lack of progress. Kenkel failed to supervise Meyers and ensure G.A. was getting appropriate services.

51.    SSD requires their teachers to keep service logs to document services are provided. SSD Meyer failed to maintain the required logs of her service minutes. The only available log of her minutes was February 2024, where Meyer's log indicates she failed to service more than half of G.A.'s special education minutes for the month. Although it was alleged that she kept a data binder for students, SSD failed to produce it. SSD required teachers

to collect weekly progress-monitoring data utilizing an online system called Fastbridge. SSD was able to obtain only six data points on G.A. from Meyer for the entire school year. They indicated no growth and/or regression.

52.    In September 2023, an SSD Speech Language Pathologist (SLP) listened to G.A. speak and noted he had speech errors that would not be developmentally appropriate at age 9. She indicated an intent to start implementing Response to Intervention (RTI) in mid-November.

53.    Rockwood reading interventionist indicated that in the first month of working with G.A., she had concerns with his blending and segmenting, and his ability to transfer those skills to an unknown word. She noted that he struggled to know all his letter sounds.

54.    The concerns with the severity of his reading deficits were not fully conveyed to parents. Even references to "summer slide" in the RSP masked the reality: G.A. had to restart the Phonics First program from scratch, demonstrating significant regression. Reports provided to parents continually suggested progress—such as an increase from six to nineteen words on the FAST CBMR—yet concealed that peer expectations for growth far exceeded these numbers.

<u>Review Existing Data for OT Concerns</u>

55.    In the Fall of 2023, G.A.'s second-grade year, both Parents and teachers were concerned with his fine motor skills. Mother was told at the Spring IEP meeting that an evaluation would be initiated in August. The RED meeting was not held until September 25, 2023, to address concerns with legibility, line adherence, and spacing in writing. The team agreed to conduct an evaluation. None of Buffington's concerns about visual perceptual issues were included in the RED for the OT to assess.

<u>Rockwood Interventionist Recommendation for More Testing</u>

56.    On September 28, 2023, Mother and Rockwood interventionist had a telephone conversation to discuss concerns with dyslexia and the interventionist's belief that G.A. needed more testing. Rockwood staff admitted they had concerns with dyslexia at the very beginning of the school year. During the call, Rockwood staff recommended that Mother get additional testing done due to concerns that SSD's testing was not thorough enough. Mother was not advised to seek an Independent Educational Evaluation (IEE) at school expense, as Rockwood staff were unaware of its existence. Instead, Rockwood staff provided Mother with information for private testing at her expense. Mother set up and paid for private testing through MetroEast Therapy at Rockwood's recommendation. G.A. was assessed on November 30, 2023. At the conclusion of the testing, the evaluator told Mother that G.A. had dyslexia, and it was a severe case.

OT Evaluation

57.    Mother was finally provided the consent form for OT testing on October 6, 2023. A limited OT evaluation was conducted in November 2023. The only assessment administered was the Wide Range Assessment of Visual-Motor Abilities, along with observations of his handwriting. The evaluator flagged reversals in numbers 4/5/9 and letters b/d/s/S/g/j/q. He also struggled to stay on the lines. The OT determined that his fine and visual motor skills did not contribute to his difficulties with reversals and handwriting.

MTSS Meetings

58.    Rockwood staff conducted regular MTSS meetings every six weeks for the entire year. Rockwood indicated the team discussed G.A. at each meeting. Meyer, G.A.'s SSD teacher, only attended once. She did not share data with the team in that meeting or at any time. Any data she may have collected was not made available for the hearing. Rockwood staff described her services as "random" and concerning. SSD did not propose any changes to his IEP despite

14

Rockwood staff's many concerns about his lack of growth. Mother did not know that G.A. was a standing topic in MTSS meetings at Fairway, or that the Rockwood interventionist harbored "major concerns" about Meyer's classroom. Mother was unaware that other reading specialists were repeatedly brought in to discuss G.A. because his lack of progress alarmed staff, or that Rockwood staff could not teach him sight words.

<u>Initial OT Evaluation</u>

59.     A conference was held on December 12, 2023, to discuss the OT evaluation. Despite concerns from every teacher working with G.A., SSD concluded that G.A. demonstrated above-average strengths in fine and visual-motor skills. He was denied services.

60.     Rockwood interventionist testified that G.A.'s disabilities impacted his ability to write. She noted he struggled with legibility, letter formation, line adherence, and reversals. He could not spell, used capital letters "strung throughout" his writing, and had inconsistent punctuation from day to day.

<u>Continued Struggles in Intervention and the Classroom</u>

61.     G.A.'s Rockwood second-grade teacher stated that over the first semester, she did not see any significant growth in his reading or writing abilities. Mother's concern grew as she saw the paperwork he was bringing home, which she described as "atrocious" and unreadable by either her or G.A.

62.     However, school documents perpetuated the misinformation that G.A. was making progress at school. His second-grade report cards labeled his skills as "emerging," despite the teacher's admission he made no growth. His Winter RSP falsely celebrated "growth" to Level D, though he never read at that level. Reports never mentioned peer norms or the true magnitude of his delay.

<u>January 2024 Growing Concerns</u>

63.    On January 4, 2024, Mother inquired about setting G.A. up with private tutoring at Dyslexia St. Louis due to his lack of progress at school. Parents paid for reading tutoring from January 2024 through September 2025.

### Renewed Request for OT Services

64.    In January 2024, Mother informed SSD staff that G.A. struggled to recall the sound a letter makes and the direction it faces, which led to forgetting what he wanted to write. Mother noted that his reversals were ongoing and prevalent in his work, and that he could not read his own writing. Mother stated she disagreed with the OT evaluation and firmly believed he needed OT.

### The MetroEast Dyslexia Report

65.    When Mother received the report from MetroEast, she cried seeing how far behind her son was in reading and writing. She immediately forwarded it to the school in January 2024. The evaluation cost the family $1395.

66.    G.A. was given multiple assessments. On the Gray Oral Reading Test- 5, G.A. scored below the first percentile in all categories: rate, accuracy, fluency, and comprehension. He took the Test of Word Reading Efficiency-2nd (TOWRE-2), which measures an individual's ability to pronounce printed words accurately and fluently. G.A. scored less than 1% in sight word efficiency, 2% in phonemic decoding efficiency, and his Total Word Reading Index was 1%.

67.    To evaluate or attempt to measure G.A.'s writing abilities, G.A. was asked to write a writing sample independently. Despite trying the task and working with the evaluator, his spelling was so poor that his sample was deemed unintelligible and unable to be scored.

68.    In the Limited writing sample provided, she noted he had large spaces between words, poor line adherence, and even poorer letter formation. She indicated that the challenges

associated with both the linguistic and motor aspects of writing warranted a diagnosis of dysgraphia. For his spelling, she recommended that the school target orthographic spelling patterns. The evaluator determined G.A.'s profile was consistent with both dyslexia and a disorder in written expression.

69.    The evaluator recommended embedding phonemic and phonological awareness into a structured literacy program as the best methodology for improving his reading, decoding, and spelling abilities. The evaluator noted his decoding skills were so poor that "reading for meaning is virtually unattainable for him at this time." The Metro East report put SSD on notice (for a second time, following their own testing) that G.A. had deficits in reading fluency, reading comprehension, and written expression.

70.    The evaluator made a series of recommendations, which included systematic and explicit instruction with a focus on the science of reading and writing. She noted that writing is critical for children with dyslexia because, without simultaneous writing instruction, their reading skills will continue to lag. She also recommended vocabulary instruction and a second opinion to evaluate G.A.'s handwriting skills and visual-motor deficits.

71.    Rockwood staff requested Mother to obtain additional outside testing so that they could better plan for services for G.A. Yet, when she paid for it and provided it to Defendants, they failed to consider it. Despite receiving the report, no member of Rockwood or SSD initiated a meeting or made any changes to G.A.'s services.

## January 2024 IEP Amendment without a Meeting

72.    On January 31, 2024, the team amended the IEP to find G.A. eligible for ESY. SSD staff testified that this would have been based on a determination of regression and recoupment for goals. Inexplicably, G.A. was found ineligible for ESY at his annual IEP meeting in April, and the amendment was rescinded. G.A. had not met his goals at the time

ESY was rescinded.

### February 2024 Continued Struggles to Read or Write

73.    Following further advocacy from both Mother Rockwood staff, the SSD OT finally agreed to provide some services. An OT goal and service minutes were added without an IEP team meeting and without parental participation.

### March 2024 Spring Reading Conference Report

74.    A March 2024 Spring Reading conference report indicated G.A. was still working on CVC words and sight words. His STAR and FAST early reading percentiles were 1%. He was making no growth in any area of reading.

### Speech Intervention Begins

75.    On March 6, 2024, a Speech Language Pathologist started seeing G.A. weekly related to his /r/ sound. Mother did not know that the SLP had identified speech concerns as early as September 2023, or that services were delayed until March 2024 due to paperwork failures. Mother has never been provided with an assessment indicating what errors G.A. was making or why he was getting intervention. G.A. continued to get speech intervention through the end of second and all of third grade. SSD made no referral for formal testing or formal speech services. After the Parents filed due process, SSD recommended an evaluation in speech and language. G.A. was found eligible as a child with a Sound System Disorder in October 2025 for errors in /r/ and /th/.  Although he did not meet state criteria for a Language disability, the evaluator noted that he had deficits in multiple areas that may adversely impact his educational performance.

### March 2024 Parent Teacher Conference

76.    At this point, Mother felt things start to get more heated.  She was still seeing zero growth, and G.A. was still reading at Level C. Mother did extensive research, which all

suggested he needed specialized dyslexia instruction, and the gold standard was Orton-Gillingham. SSD was not providing him with any research-based programming during second grade.

### April 2024 Continued Struggles

77.    Ms. Peterson acknowledged that G.A. could not independently read his science work, his social studies work, his math work, or his English language arts in class. He was not provided a paraprofessional to assist him or access to assistive technology by SSD. His second grade teacher felt G.A. needed specialized instruction in reading, writing, OT, and speech. She shared her concerns during IEP and MTSS meetings.

78.    April 16, 2024, STAR reading assessment placed G.A. at 1%, 3.86 grade levels behind his peers. His STAR Math assessment ranked him in the top 97% of his peers.

### April 2024 IEP Meeting

79.    An annual IEP meeting was held on April 17, 2024, at the end of G.A.'s second-grade year. Staff concerns included: "G.A.'s concerns are solely academic, pertaining to reading. With his deficits in basic reading, he struggles reading grade-level text, which impacts all other academic areas." His grade reports showed he was not mastering grade-level standards in reading or writing

80.    G.A. met none of his IEP reading goals. For his OT goal, his OT noted that his spelling errors made his writing difficult to read, and he continued to have reversals. Spelling instruction falls under written expression eligibility. G.A. was not receiving any services in written expression or spelling.

81.    His unmet reading goals were repeated verbatim in his new IEP. These goals failed to address the more complex literacy demands of second grade, where students are expected to read multisyllabic words, apply phonics knowledge to varied patterns, and begin

developing fluency and comprehension across connected text. No discussion was had around writing goals, spelling goals, phonemic awareness goals, fluency goals, comprehension goals, etc. No discussions about service changes were conducted, and no PWN were issued. No proposed changes were made for the upcoming school year.

82.     Progress data reported to Mother by Meyer was inaccurate and inflated his growth in reading.

83.     The team kept telling Mother he was making some progress despite none of the data showing growth. When Mother asked for something a little more evidence-based for dyslexia, the school offered nothing.

84.     Because both SSD and Fairway failed to disclose internal intervention data, encoding data, and the teacher's and interventionist's serious concerns with the nature and severity of G.A.'s learning disability, along with their concerns about the lack of a research-based intervention in the SSD classroom, Mother's ability to participate in the meetings was negatively impacted.

<u>April 2024 Lack of Progress and Emotional Concerns</u>

85.     Rockwood interventionist reached out to Mother in April 2024 because of concerns with G.A.'s mental state at school. She called Mother to report that G.A. was very frustrated in class and he broke down in tears. The interventionist said that as the year went on, G.A., who was a very bright kid, realized what he could not do compared to his peers. She noted his social-emotional state was wavering negatively, and he was struggling and feeling the struggle more.

86.     G.A.'s second grade teacher admitted G.A. expressed frustration in her classroom over being unable to read. She noticed his frustration increase over the course of the year when he would come back from his interventions.

87.     When asked about data on G.A.'s skills, the Rockwood Reading interventionist admitted he started second grade with a STAR report in the 1% and ended with 1%; he started on a Level C and ended on a Level C; his progress in Phonics First was not good so he was switched to SIPPS; in SIPPS he finished the year further behind in the program than where he initially started. Mother was not made aware of his regression in the reading intervention.

### G.A. "Toughest" Case of Her Career

88.     On May 3, 2024, in an internal email, the Rockwood reading interventionist described G.A. as having "severe Dyslexia." She planned to keep G.A. in her interventions the following year because she had concerns with the interventions/activities he was getting in SSD. She described G.A. as "the toughest reading case I've seen yet in my career." Mother was not told this information.

89.     In the internal email, the Rockwood interventionist stated: "I'm hoping SSD steps up next year and begins implementing research-based supports and not random things."

### Mother Seeking Help from SSD

90.     Mother was told that the MTSS team discussed G.A. at their last meeting and the need for a "clear cohesive plan" in the Fall. Rockwood interventionist stated that the lack of a clear, cohesive plan had been a concern of hers for the entire year. She stated that having too many teachers using different methods could be confusing for him.

91.     Mother began contacting others in SSD to seek services. She expressed concern that she had asked for a trained Orton-Gillingham teacher at the beginning of the year, but was told the district did not have any Wilson-trained teachers and that the cost to certify a teacher was too high.

### Staff Instructed to Stop Communicating with Mother

92.     On May 3, 2024, Rockwood Principal Lorinda Krey sent an email to Rockwood

staff working with G.A. to give them a "heads up" and advise them to "no longer communicate" with Mother until Krey and SSD Kenkel can collaborate. The email was also forwarded to the SLP working with G.A. As a result, G.A.'s classroom teacher, intervention teacher, and SLP all stopped responding to Mother at that time.

Mother Requests Orton Gillingham Instruction

93.    Mother responded to the entire IEP team she felt G.A. was not getting what he needed from Rockwood/SSD. She noted he needs consistent instruction from an Orton-Gillingham certified instructor and specifically referenced Wilson. Mother noted that the family was paying for an OG tutor privately, and he was being checked out of school 2-3 times a week and driven to services, which were taking a toll on G.A.'s social and emotional health. She said the school's instruction was contradictory to what she was paying for privately. Mother noted that until G.A. received clear and consistent reading instruction at school, resulting in measurable progress, she would not stop fighting for him.

Kenkel's Promise of a Certified Wilson Teacher for G.A.

94.    On May 9, 2024, SSD Area Coordinator Ellen Kenkel spoke with Mother and promised her that a Wilson-certified teacher would travel to Fairway to provide Wilson instruction to G.A. the following Fall. Mother cried happy tears because G.A. was finally going to get the services he needed in his home school.

95.    On May 10, 2024, Kenkel sent an internal email to all involved parties in both Rockwood and SSD stating that she had a "nice conversation" with Mother and that they will amend his IEP to reflect an increase from 90 minutes to 150 minutes in the fall, and he will receive Wilson instruction beginning in August.

96.    Kenkel instructed staff not to name the Wilson program in the IEP. She admitted SSD could change the programming or explore other options at any time.

## IEP Amended from 90 to 150 MPW of Basic Reading

97.    An IEP amendment was drafted to increase his service minutes from 90 mpw to 150 mpw or 14% of his school day. Because SSD was adding 60 mpw of instruction, Rockwood removed him from his 150 mpw of daily Rockwood reading intervention for the following year. Despite the severity of his deficits, the Districts ultimately gave him fewer minutes of reading instruction. He would only receive SSD reading services for third grade. G.A. was still not found eligible for ESY or offered AT services.

98.    Kenkel acknowledged that ESY should consider all of the following: nature of disability, severity of disability, progress, opportunities to practice skills outside of the classroom, and regression and recoupment. SSD has espoused G.A was severely dyslexic and he remained a non-reader at the conclusion of second grade. Rockwood data showed significant regression over the prior summer. However, he was not considered for or offered ESY. As a result, G.A. continued to receive private tutoring over the summer at Dyslexia St. Louis until June 2024 the time frame ESY is generally provided.

99.    His second-grade teacher did not see any growth in G.A.'s reading level over the course of the year. G.A. did not meet grade-level expectations in reading or writing.

100.    Between February 2024 and June 2024, G.A. attended 30 tutoring sessions at Dyslexia St. Louis. His tutor worked with him on phonemic awareness using Kilpatrick drills and the Barton Reading and Spelling System. She was a certified elementary education teacher with a reading specialist certification. G.A. also worked on his handwriting and letter formation with his tutor. Because Kenkel had promised him a certified Wilson teacher in the Fall, Mother stopped his tutoring for the remainder of the summer. Mother paid $2895 between January 2024 and September 2024 to Dyslexia St. Louis.

## Securing G.A. a Certified Wilson Teacher

101.    Kenkel initially arranged to provide G.A. a certified Wilson teacher. However, when another elementary school also wanted her, Kenkel agreed to let the certified teacher go to a different building. Kenkel chose to place G.A. with a Samantha Branson, a teacher who had never implemented the Wilson program. SSD provided Branson with a brief introductory training, bought her the materials, and assigned her to G.A. and another student. Each new teacher in Wilson is assigned a practicum student. The student must meet specific requirements to be assigned to a new teacher learning the program. G.A. did not meet the majority of the criteria to be a practicum student. SSD Mollie Bolton and Kenkel decided to assign him to Branson anyway, despite knowing he was not a good match for a new teacher.

## F.    Third Grade (2024-2025)

102.    On August 22, 2024, G.A. took a STAR Passage Oral Reading Assessment and was only able to read 11 cwpm with 44% accuracy. The passages are grade-level passages scored by the teacher as the student reads them.

103.    G.A.'s third grade teacher acknowledged that G.A. entered her class as a nonreader. Because he could not read, she paired him with a friend or buddy in class each day to read to him and write for him. Everyone in her classroom knew that G.A. could not read. She also noted he had obvious speech articulation errors and mispronounced words.

104.    SSD did not provide a paraprofessional in the third-grade classroom. SSD also did not provide assistive technology supports at the beginning of the school year.  Rockwood did not supplement his reading with any interventions, nor did they provide a Reading Success Plan during third grade.

105.    On August 26, 2024, a STAR encoding test not only showed that G.A. could not spell any words correctly, but also that his handwriting and attempts to spell were mostly illegible, with letter reversals. He missed all 25 words on the list. An individual looking at the

list would be hard-pressed to decipher any of the words on the page. Parents were not made aware of the encoding tests, and the data was not reported to them.

Mother Informed Branson Providing Wilson

106.    At the beginning of the year, Branson emailed Mother that G.A. would receive Wilson instruction from her for 30 minutes per day. Mother knew Branson was not a certified Wilson teacher and immediately began emailing to inquire why SSD was not providing the promised Wilson-certified teacher.

107.    Mother reminded staff that she had decided not to remove G.A. from the district based on the promise. SSD refused to honor its promise, and G.A. remained with Branson, who had never taught the Wilson program. Defendants Bolton and Kenkel knew that G.A. was not an appropriate student to pair with a first-year Wilson instructor.

108.    G.A.'s August 28, 2024, STAR reading report placed his percentile rank at 2% and his growth at 1%. He was 4.03 grade levels behind his peers.

109.    Concerned with SSD's refusal to provide a certified teacher, Mother began exploring other options, including Churchill, a school for children with dyslexia. On August 30, 2024, Mother escalated her concerns within SSD and emailed Defendant Bolton in a "last ditch effort to get my son the help he needs." The email was fruitless, as Bolton had decided to disregard the practicum requirements and assign G.A. to Branson. Mother explained she had spent countless hours and thousands of dollars trying to help her son and that G.A.'s deficits were far too significant to gamble with someone just learning the program. Her concerns were remarkably consistent with the very rationale Wilson used for carefully selecting the types of students a first-year teacher should be placed with while learning the program. She again requested a certified Wilson teacher.

110.    SSD circulated numerous internal emails with the stated purpose of keeping a

united front when dealing with Mother. On September 5, 2024, Kenkel sent an email to Mother and stated the district intended to proceed with Branson working with G.A. She stated: Throughout [G.A.'s] time at Fairway, we have worked closely with building administration, classroom teachers, and his reading interventionists to ensure a unified approach in addressing his needs. I'm confident that the programmatic change to Wilson Reading will be effective for him, and we look forward to seeing positive progress and growth as he engages with the program.

111.    On September 5, 2024, G.A. was given another STAR encoding test. He again scored zero correct.

112.    On September 6, 2024, Mother responded via email with Branson. Mother expressed feeling as though she had been led down a path for years with the promise of improvement, with no gains. She asked Branson to understand that she was hesitant to trust SSD for a third year. She stated that she hoped, over the first semester, she would be proven wrong and that G.A. would show growth.

113.    While researching her options, Mother learned that the minimum fidelity requirements for the Wilson program were 180 minutes of instruction per week. SSD had only offered 150 minutes. Mother requested 180 minutes, and SSD relented, increasing his services to the minimum number allowable for fidelity. Defendant Bolton was aware of Wilson's fidelity requirements and SSD's intent to disregard them before Mother's email. SSD Kenkel also had a supervisory obligation to understand the programming offered by her staff and the requirements for fidelity to programming. Despite increasing his minutes, Branson remained unable to set a schedule for G.A. that complied with the Wilson fidelity requirements. Minimum session length for Wilson is 45 minutes. Branson was only allotted 30-minute blocks to work with G.A.

114.     G.A. did not receive any written expression services at all in third grade. His third grade teacher was unable to read his work and described his writing as scribbles. In a form for Churchill, she indicated G.A. was performing below grade level in written language, spelling, reading, and grasping new concepts. She called him "significantly below grade level" in both reading and writing. She described him as "awesome" in math.

October 2024 Parent-Teacher Conferences

115.     A slew of internal emails were generated about Mother as the conference neared. The team knew they would be confronted with Mother's ongoing concerns with G.A.'s lack of progress. Staff talked derisively about Mother and feared she would want more than her fifteen minutes of conference time.

116.     Mother told staff she was not seeing progress at home and asked how to help him. She stated she can't read anything he writes and can rarely find any words he can read. She asked to see evidence of his progress that was reported in his IEP. Staff again assured her he was making progress.

117.     G.A.'s STAR report on December 3, 2024, placed his reading at 4% and his growth at 41%.[1] He was listed as 4.38 grades behind his peers in reading. The STAR assessment "Domain Scores" showed that after the first semester, he had only mastered 9% of the expected content for the year.

118.     A December 5, 2024, STAR encoding test was again given to G.A., and he again missed every one of the 25 words. It was not shared with Mother.

119.     On December 17, 2024, Branson shared a graph with Mother and Jones showing his data on reading decodable and nonsense words in Wilson and Fastbridge. At no point did

---

[1] Average growth is 50% while 35-65 is in the average range. For Rockwood students on an IEP, the average growth was 53.25% for the same Winter 2024 testing window.

she inform Mother that the Fastbridge words were composed entirely of CVC words that he should have mastered with 100% accuracy in Wilson Step 1.3, which he was deemed to have completed in October 2024. The graphs were presented to Mother as depicting evidence of progress.

<u>G.A. Still Stuck at Level C</u>

120.    On February 2, 2025, Ms. Jones administered a Kindergarten Level D reading assessment to G.A. His accuracy was only 85% indicating it was too hard to be considered his instructional reading level.

<u>Staff Upset with Mother's Inquiries about Lack of Progress</u>

121.    On March 6, 2025, the OT and Branson exchanged emails where Branson warned the OT that Mother was upset with the lack of progress. The OT expressed her belief that G.A. did not even need OT based on her testing. The OT avoided attending the meeting. In fact, she never showed up at any meetings with Mother to discuss G.A.

122.    On March 10, 2025, Branson met with SSD administration to brainstorm and prepare for the conference. Branson was worried about Mother's likely concerns with the lack of progress and her lack of certification in Wilson. They came up with talking points, including telling Mother that certification was not required; that students like G.A., with low test scores, move more slowly than average; that the program was being used with fidelity; and that G.A. is making progress each quarter across all data sources. Branson's 'talking points' failed to consider Wilson's Program Implementation recommendations, which suggested he get substantially more than the minimum minutes, or that G.A. should not be working with an uncertified teacher during her training year. The program was not being used with fidelity and he was not making progress based on the data. But, Mother was again told G.A. was making progress in the Wilson program and improving.

<u>March 2025 IEP Meeting</u>

123.    G.A.'s annual IEP was held on March 25, 2025. The PLAAFP introduction was short, listing only concerns with blending, high-frequency words, and letter/number reversals. It was a copy-and-paste from the prior year.

124.    Parents again noted concerns about learning at school, specifically in reading and writing. The PLAAFP quoted his classroom teacher as stating that G.A. was making "little progress" in reading and writing. He was still not receiving any specialized writing support, despite his significant deficits and inability to write in the general education classroom. Instead, his general education teacher needed to scribe for him. His teacher also had classmates read and write for him. Mother reported seeing no improvement in his reversals, and his OT did not attend the meeting.

125.    Branson told Mother that G.A. was progressing through the Wilson books, but Mother felt that none of it was translating at home. Mother, who had Branson's word cards at home, tested G.A. before the IEP meeting that morning to see if he could read them; he got only 3 correct. Branson continued to assert he was making progress and insisted he could read the word cards. Privately, Branson engaged in discussions in which Mother was called "nasty," "rude," and "contentious" for asking questions and airing her concerns.

126.    Branson presented Fastbridge data as progress when it actually signaled a failure to master the foundational skills in Wilson Step 1.3. This skewed presentation was part of an ongoing effort to convince Parents their child was making progress. Branson created colorful bar graphs that, at first glance, appeared to show growth, when in reality the student was making no meaningful progress. The graphed data showed G.A. had not mastered short vowel sounds.

127.    Mother brought writing samples to show the team and expressed her concerns

about her son's writing ability. G.A.'s classroom teacher also expressed concerns with his writing. SSD did not offer G.A. any writing services at that time. No goals were proposed in any of the following areas during the meeting: written expression, encoding, phonemic awareness, reading fluency, or reading comprehension.

128.    His aReading assessment scores for Fall and Winter 2024 were 1% and 2%. Mother recalled Krey stating that she thought the growth on his Star scores (2%) was 'fantastic' and made a 'really, really big deal' about it. Krey told Mother it was her 'hope and dream that every kid at Fairway would improve the way that G.A. improved'. Kenkel called it a "huge celebration". Neither Krey nor Kenkel, who had access to the full STAR report, told Parents that G.A had regressed even further from his peers according to the data. SSD and Rockwood joined in to insist that Wilson was working and G.A. was making significant progress.

129.    G.A. could only read 9 wpm for decodable words with 57% accuracy and 8 wpm of nonsense words with only 30% accuracy, according to the March 2025 IEP.[2] An average third grader starts the year reading approximately 83 wpm and ends the year around 112 wpm.

130.    At the conclusion of the IEP meeting, SSD regurgitated the same basic reading goal, initially written in first grade, only changing the baseline. His high-frequency word list goal also remained the same, with the same baseline from two years prior, as he had made no meaningful progress. Because he had not mastered CVC words, no one had begun to work on the other syllable types in the goal.

131.    SSD and Fairway failed to disclose internal intervention data, encoding data, and the teacher's and prior interventionist's serious concerns about the nature and severity of

---

[2] The numbers in the IEP are starkly different than the numbers presented to Mother during the May 2025 IEP where his accuracy rates for the same measures were reported above 67% and 87%.

G.A.'s learning disability and the lack of fidelity in implementing the Wilson program, all of which negatively impacted Mother's ability to participate in the meeting. Staff repeatedly told her he was making progress.

132.    Despite his inability to read and his goals being repeated again, G.A.'s reading instruction minutes remained fixed at 180 per week.

133.    G.A.'s OT goal was poorly written and was not measurable. After significant advocacy by Mother, his OT minutes were increased from 30 mpw to 60 mpw.

134.    G.A. was denied ESY without any meaningful discussion on the topic or presentation of data. The PowerPoint prepared before the meeting indicated that the team determined he was not eligible 'at this time'. Kenkel acknowledged that no one was available to teach Wilson for their summer school when they deemed him ineligible. Kenkel admitted Parents were not offered ESY. Nothing in the IEP references any analysis of ESY factors.

135.    No parent training was offered as part of the IEP to help Parents work with G.A. and assist in his acquisition of reading skills.

<u>Offer of Assistive Technology</u>

136.    Mother asked in the IEP meeting what the end goal was for G.A. and if he would continue to be passed on to the next grade, not knowing how to read. She expressed fear that G.A. was on track to graduate from high school unable to read. At that point, SSD brought up AT and informed Mother that resources were available to read and write for him.

137.    G.A.'s list of needs continued to grow as he advanced in grades. His third grade teacher indicated G.A. could occasionally spell CVC words with around 50% accuracy. A typical third grader would be expected to read CVC, CCVC, CVCC, and CVCE words with greater than 85% accuracy and also read additional syllable types and multi-syllable words with fluency. She also noted that third graders are expected to be able to read high-frequency words, and that is

not a skill still taught in third grade. She acknowledged that G.A. could not read most high-frequency words. She admitted that third grade is a crucial year for a child to learn to read.

138.    His Rockwood teacher also testified that G.A. could not independently write an essay, a grade level expectation. She testified that G.A. would benefit from and does need specialized writing instruction.

139.    Concerns about his inability to write remained front and center during the April 7, 2025, Assistive Technology Support meeting and were noted in his Support Plan. In the plan, the concerns are listed as G.A.'s inability to read word problems, copy from the board or a worksheet, read, write, or spell, and concerns about handwriting.

<u>End of the Rope for Mother</u>

140.    After the IEP meeting, Mother described herself as at the end of the rope because G.A. was making no progress at Fairway, and she had exhausted all her options. As a result, she reached out to counsel.

141.    On April 9, 2025, G.A. took a STAR Math assessment and ranked in the 99th percentile, with 98% growth.

142.    G.A.'s April 16, 2025, STAR reading report placed his percentile rank at 2%, and 4.86 grade levels behind his peers as he completed third grade. His growth percentile was 18% while the average growth is 50%[3]. He lost ground on his Domain Scores and mastered less than 10% of the expected content.

143.    On April 23, 2025, a 10-day letter was sent to SSD/Rockwood notifying the Districts of the family's intent to place their son at Churchill, a private school for children with dyslexia and other learning disabilities, and requesting reimbursement from the district. The

---

[3] Despite dropping from 4% to 2% nationally, that still registered as 18% growth.

Districts were informed that the change in placement was due to their failure to provide G.A. with a FAPE and to identify his learning disabilities in Reading Fluency, Reading Comprehension, and Written Expression.

144.    His third grade teacher noted that G.A. was still reversing letters at the end of the year, and his handwriting was still illegible. She also stated that G.A. made no progress in his reading levels all year.

145.    On May 1, 2025, his Rockwood teacher read G.A. a Level P grade-level passage to test his listening comprehension skills. G.A. struggled to summarize the story and was not proficient in answering the questions, even when he did not have to decode the words himself. He had no goals or services in reading (or listening) comprehension.

146.    On May 5, 2025, another STAR encoding test was provided to G.A., and he again spelled zero out of 25 words correctly and continued to reverse both letters and numbers on the test. Parents were not made aware of the encoding tests.

147.    On May 9, 2025, his Rockwood teacher administered a Kindergarten Level D reading assessment, which was deemed too hard. She noted that G.A.'s fluency was 21 words per minute, while the grade-level expectations at that time were 107 words per minute. Despite these concerning stats, the Rockwood teacher told his mother that he "showed quite a bit of growth" and it was the "best she ever heard him read." She stated she was "truly blown away" by his May reading compared to his February reading. In truth, his oral reading had dropped from 31 words per minute in February to 21 in May, with declining comprehension scores, and he was still using a kindergarten picture book as he completed third grade. Under no objective measure could that be called growth. Yet, each time Mother raised concerns, she was met with similar assurances.

<u>May 2025 RED and IEP Meeting</u>

148.    SSD noticed a RED meeting and an IEP meeting for May 13, 2025.  SSD stated that the goal of the meeting was to discuss what additional services SSD may be able to offer G.A. to support his basic reading goals.

149.    His classroom and Special education teachers stated that G.A. struggled with letter and number reversals when writing and struggled with line adherence and legibility. Parents reported that his OT support was not translating to other work. They also noted that his confidence was plummeting due to the lack of academic growth.

150.    The RED document is the first time Parents were made aware of the District's encoding assessments. G.A.'s grades in applying phonics, comprehending fiction, comprehending nonfiction, reading fluently, and applying phonics in writing were all listed as a score of 1, an area of concern.

151.    The RED document does not include a single piece of the data from the 16-page MetroEast evaluation. There is no indication it was ever read, reviewed, or considered by anyone in SSD.

152.    When Parents suggested that prior testing indicated that G.A. was eligible for services in other areas, including written expression, SSD failed to offer additional services and insisted on retesting him. SSD declined to conduct the testing over the summer.

153.    SSD staff, including Kenkel and Bolton, summarily stated that they determined ESY would not be considered because he was not showing regression on his goals. When asked why they would only consider regression for a student who was still at the kindergarten level and had never made progress, SSD declined to revisit their decision.

154.    When parents expressed concerns about SSD's ability to teach their child to read and requested placement at Churchill, SSD insisted that the meeting's focus was on exploring additional services it could provide at Fairway. SSD declined to consider a change in

placement. Bolton expressed her belief that SSD's provision of Wilson was both appropriate and resulted in progress.

155.    At the conclusion of the meeting, SSD continued with the same CVC reading goals that had been written 2 years prior and had never been met.

156.    Concerns with spelling were raised by Parents, prompting SSD to acquiesce to an encoding goal. SSD declined to write the goal in the meeting. Despite concerns about written expression noted by everyone who worked with G.A., SSD did not propose a writing goal. No writing, reading fluency, or reading comprehension goals were proposed. SSD proposed adding 60 mpw to the IEP to address the encoding goal.

157.    No parent training was offered as part of the IEP to help Parents work with G.A. and assist in his acquisition of reading skills.

158.    Parents questioned why G.A. was still being offered the mandatory minimum number of minutes in the Wilson program and expressed concern that the way it was being implemented clearly showed G.A. was not making growth. SSD Bolton praised Branson's efforts and offered no additional minutes or changes to the programming.

159.    After the unsuccessful meeting, the Parents enrolled their son at Churchill. They also filed a Due Process on May 14, 2025. After the Due Process was filed, the Parents paid the summer school deposit at Churchill.

160.    SSD sent a PWN after the May meeting, noting the addition of the encoding goal. Under "other relevant factors," the notice states that the team discussed increasing service minutes, but Mother was "hesitant due to concerns about missed class time" and referenced adding assistive technology minutes rather than increasing special education minutes on March 25, 2025. This contradicted the testimony of Branson and Kenkel, who both stated that Mother was never offered additional minutes of service. This new "relevant factor" was

conspicuously absent from the PWN issued immediately after the March 2025 IEP meeting and only appeared in SSD's documentation after litigation commenced.

161.    The revised IEP, which includes the SSD-proposed encoding goal, was sent to parents. Branson testified that the encoding goal proposed by SSD 'went along with the Wilson program' and 'matched what he was working on for decoding'. The goal was inconsistent with Wilson's spelling expectations and lacked a data-supported baseline. The 23-page May 2025 IEP does not make a single reference to the MetroEast evaluation (or to any evaluation at all).

### Wilson Instruction with Fidelity

162.    Wilson is a program developed based on the science of reading. Wilson has a significant training component due to the program's complexity. To be Wilson certified, an individual must attend a three-day introductory workshop and then participate in a year-long practicum supervised by a Wilson trainer, during which they must submit 65 complete lesson plans, with an approved practicum student. In addition, there is a 90-hour online course that is very intensive and is eligible for 9 hours of college credit.

163.    Wilson sets recommended service minutes at significantly higher levels for students like G.A., who score well below grade level. Wilson is not recommended for 30-minute lessons, like the ones G.A. was receiving, because it does not allow enough time to complete a full block.

164.    Teachers must follow strict guidelines in the procedures they use, the phrasing, and the benchmark requirements to utilize the program with fidelity. Wilson is a ten-part program, broken into three blocks. The first block focuses on word-reading accuracy, the second on spelling and sentence dictation, and the third on reading passages for fluency and comprehension. All ten steps in all three blocks are required to use the program with fidelity. Limited exceptions are made for teachers in training, but the best practice is to do a complete

lesson with all parts.

165.    The final block ties the skills taught together. The Wilson trainer testified: "Don't short change block three. It's essential." A student who can successfully read the passages in block three demonstrates that the skills are internalized, and they are ready to move forward.

166.    Wilson has specific metrics for determining when a child has mastered the skills to move from one substep to the next. In Block 1, a student must accurately read 15 of 15 real words with automaticity, in less than 35 seconds. The student must also read 13 of 15 nonsense words automatically. The student also needs to spell with 75% accuracy at the level. The program also introduces high-frequency words at each substep.

167.    The skills taught in Wilson Book 1 are the foundation for everything else. A student who struggles to read words composed of three sounds automatically or accurately will be on shaky ground and unable to make progress if you add more concepts when they are still struggling with that skill. Mastering the short vowel sounds in Wilson Step 1.3 is critical before moving to a new level.

168.    During dictation exercises, Wilson-certified teachers are trained to help students correct their errors directly on the dictation page and to work with them to improve correct letter formation.

169.    Because of the program's complexity, Wilson sets strict qualifications for practicum students so that a new teacher has time to learn the program as it is designed for a typical Wilson student before being exposed to students with the most severe needs. An approved practicum student includes a student in fourth grade or above, with limited exceptions. The student should score between 5% and 30% on a reading assessment. G.A. was a

third grader who scored below the 1%.[4] The specifications for a practicum student are designed, in part, to benefit the teacher, enabling them to progress through the program and focus on the substeps. A teacher who has not completed Level I certification would have difficulty adapting the program for a student with more significant needs.

Branson's Implementation of Wilson

170.    Branson implemented only pieces of the Wilson Reading system with G.A. during his third-grade year. As part of the Wilson program, she used a dictation journal, lesson plans, word charting, and various other Wilson-related materials. Outside of Wilson, she also used weekly charting in the Fastbridge system to assess G.A.'s ability to read both real and nonsense CVC words.

171.    Branson did not use the program as designed or with fidelity. She did not adhere to the mastery requirements for advancement between steps. She skipped much of Part 2, the encoding and dictation section. She ignored virtually all the required components of Part 3, the comprehension section. She fully acknowledged that G.A. could not independently read the Part 3 passages and answer the questions, but she moved him on anyway. Branson described asking him to read the short passages as "overwhelming," and so she would read them to him so he did not 'muddle' through them. She moved him forward despite his inability to read the required passages, or even sentences, with ease and fluency.

172.    Branson was aware, through her weekly Fastbridge assessments, that G.A. was unable to read basic Step 1.3 CVC words with the required 100% accuracy, even as she pushed him into higher steps, against Wilson's fidelity standards.

173.    Branson also failed to correct his spelling and letter formation on dictation sheets

---

[4] Parents were not informed SSD performed a Woodcock Johnson assessment on him, nor that he failed to meet the requirements of a practicum student.

when she did utilize them. Branson claimed this was not her "area of expertise." She also failed to provide him with appropriate corrective feedback because she said it would cause his face to "drop" and he would get down on himself. As a result, the dictation pages are replete with errors, and G.A. made no meaningful improvement in his spelling or handwriting over the year.

174.    Branson used some of G.A.'s Basic Reading minutes to work on reading fluency, reading comprehension, and spelling, but did not increase his special education minutes to support these areas. She also failed to keep data and report progress, or lack thereof, in these areas.

175.    Branson never utilized Step 10, and her failure to use Step 9 as designed meant G.A. never received a single Wilson lesson with fidelity.

176.    Branson observed G.A. struggle with his confidence throughout the year. She noticed he became upset or looked down on himself whenever he made a mistake or struggled with reading. She could see him get nervous when there was too much information, and he would start stumbling over words. She described him having a physical reaction, becoming physically nervous, and his facial expressions falling when he made mistakes.

<u>SSD's Implementation of Wilson Districtwide</u>

177.    This lack of fidelity to instruction in Wilson is not an isolated incident in SSD. It is also not just a concern with Branson. In 2018 to 2019, SSD evaluated its Wilson Reading System implementation and documented pervasive failures in training, implementation fidelity, and oversight. Defendant Bolton participated in the study and in the finalization of the report. In the study, SSD found that 76% of the students they served failed to achieve proficiency in ELA according to the 2018 Missouri state assessments. The report concluded that Wilson, as implemented in SSD, appears unlikely to substantially "close the gap" in

literacy for a large proportion of SSD students who receive reading services.

178.    In fact, regardless of the intervention offered by SSD, students receiving SSD reading services demonstrated negligible within-year mean normative growth, suggesting the need for more effective instruction for struggling readers. Among students working with a teacher who had some Wilson training, 54% still had SGP scores below the 50% level, indicating that more than half showed regression relative to peers. Regression was documented in 65% of all students working with non-Wilson-trained teachers. The data showed that 35% of the students with a Wilson-trained teacher and 44% of the students without one had an SGP score below 30%, suggesting significant regression relative to peers.

179.    SSD recognized in the report that literacy gaps resulted in an increased risk of dropping out of school, economic instability, and social and psychological problems. SSD stated, "[a] student's likelihood of graduating high school can be predicted based on their reading level by the end of grade three." Additionally, SSD cited a study by the Children's Reading Foundation that explained "up to half of the printed fourth grade curriculum is incomprehensible to students who read below that grade level." SSD was aware of the urgency in teaching children to read.

180.    The evaluation report highlighted that implementation decisions and practices surrounding the use of Wilson were essential to ensure resources were allocated to achieve the greatest impact. The report warned that teachers were being asked to deliver Wilson lessons without the required certification or training because SSD had reduced the training requirements without Wilson's approval. Defendant Bolton actively participated in modifying and reducing the Wilson training requirements. The report found a lack of oversight left teachers to modify or omit key lesson components, blend Wilson with unrelated programs, and shorten instruction in ways that undermined fidelity.

181.    The evaluation also acknowledged a complete lack of systematic monitoring at the district level, leaving oversight to individual schools and resulting in wide variability in program quality, as well as a lack of fidelity mechanisms beyond the initial training period. Branson never had a single lesson with G.A. observed by a trainer. Neither Krey nor Kenkel had Wilson training to provide oversight.

182.    Another flaw noted in the report included the lack of collaboration between the special educators and the general educators, resulting in a lack of reinforcement of the skills being taught. As a result, student progress was inconsistent and significantly hindered, with many children failing to show meaningful growth. Rockwood teachers were not provided any training in Wilson to support G.A. in the classroom.

183.    Despite these explicit findings in 2019, the Districts have taken no meaningful corrective action. Kenkel, Branson's supervisor, was unaware of the study and had not read it. The same failures persist today: teachers remain under-trained, interventions are still delivered with poor fidelity, and oversight remains largely absent. The lack of collaboration also persists.

184.    Defendant Bolton was acutely aware of G.A.'s significant reading impairment but actively chose to place him with an uncertified teacher, who went through SSD's modified training, who had not completed the 90 hours of online training, and was not observed once working with G.A.

185.    The Districts were aware of these systemic deficiencies as of 2019, yet failed to remedy them. Defendant Bolton, the current Chief of Teaching, Learning, and Accountability, was actively engaged in the 2018 study. She is a Wilson-certified trainer who trains and oversees the utilization of the Wilson program in SSD. Bolton participates in the vetting and selection of literacy curriculum in SSD.

186.    Bolton disregarded the practicum requirements for G.A. and approved him to work with Branson. Bolton was aware that he did not meet the grade level requirements or the Woodcock-Johnson requirements. She was familiar with the concerns of Mother, who emailed her on multiple occasions. No one observed a single lesson with G.A. to guide Branson. When G.A. had still failed to master basic CVC words after nine whole months of working with Branson, Bolton attended his IEP meeting and proposed no changes to his goals or services in reading. After the meeting, Bolton participated in writing an encoding goal that was in direct conflict with the Wilson program.

## G.    Churchill School

187.    Churchill is a private, non-profit school for students with language-based learning disabilities. Students are high-potential students who have been diagnosed with learning disabilities in reading, written expression, or math, and may have executive functioning deficits or ADHD. Churchill accepts children with and without IEPs if they have a documented learning disability. The approximate price to attend Churchill is $40,000 per year.

188.    Although Churchill is not DESE-approved, it is accredited by the Independent Schools Association of the Central States (ISACS) and certified by the International Dyslexia Association.[5] Churchill's goal for all students is to remediate their skills so that they can return to a traditional classroom and meet performance expectations for their grade level.

189.    Churchill has small class sizes and minimizes distractions in the room while providing adjustable seating and opportunities for movement. Every teacher at Churchill is either certified in Wilson or in the process of becoming certified. Wilson trainers are on staff

---

[5] They are also member of: The Association of LD Schools, The Learning Disabilities Association of America, The National Association for Independent Schools, The National Council of Teachers of Mathematics, and The Independent Schools of St. Louis.

and are intimately involved in ensuring the fidelity of instruction and the progress of all students.

190.    Every subject is taught at grade level and in a way that ensures students can access the content regardless of their reading level. Instructors incorporate extensive reading into their curriculum, complemented by multisensory auditory lessons and visual presentations to keep students engaged. Churchill also employs a range of instructional strategies, including teaching effective note-taking skills, listening for main ideas, and test-taking techniques.

191.    G.A. attended Churchill summer school from 8:20 to 2:20 daily between June 9, 2025, and July 18, 2025. G.A. was assigned a certified Wilson teacher with five years of Wilson experience. He was severely behind grade-level expectations in reading, writing, and spelling. Because SSD had not taught him to mastery in the beginning levels of Wilson, Churchill had to start G.A. back over in the program at Level 1.3.

192.    Churchill does not employ occupational or speech-language therapists, so G.A. was unable to access those services. Churchill does work on letter formation and fine motor skills with students in their tutorial class and in language arts.

193.    G.A. gained more confidence and skills in six weeks at Churchill than he had in the prior two and a half years at Fairway. After only two weeks at Churchill, G.A. volunteered to spell 'box of rocks' on a camping trip, and it was the first time his Mother heard him spell anything, leaving her in tears. As the summer went on, G.A. read things he saw in public, including 'Six Flags' on the side of a van, and he sought out a *Dog Man* book from his brother and was reading it voluntarily, something he had never done before. His writing also improved.

194.    On his first day of summer school, G.A. was so upset that he had to go that he kicked the back of Mother's seat on the drive and did not want to go into the building. After the

first day, there was never a struggle, and he enjoyed attending school and felt empowered at Churchill. G.A. told his parents partway through the summer that he wanted to attend Churchill in the Fall.

195.    G.A. made progress over the summer, including increased confidence and improved accuracy in letter and sound recognition. G.A. was still working on Step 1.3, but he was gaining accuracy, and things were sticking. He was also making progress with sight words in both reading and spelling.

196.    G.A. enrolled in Churchill for the Fall 2025 semester. He continues to make progress in that setting on his reading, writing, and spelling.

197.    The Summer School tuition for Churchill Summer School totaled $8,950. Parents also made two 32-mile round-trips daily for drop-off and pick-up. Parents are seeking reimbursement for Churchill's tuition and travel expenses.

SSD Fall 2025 Evaluation

198.    SSD conducted additional evaluations after the conclusion of the Due Process Hearing in the Fall of 2025 while G.A. attended Churchill. IQ testing continued to place G.A. well above average, at 87%.

199.    Language testing noted weaknesses in multiple areas. Although his scores were not low enough for eligibility as language-impaired, the evaluator noted that his deficits were likely to adversely affect him in the classroom. G.A. has never received language services from SSD.

200.    G.A. had a speech evaluation. Despite receiving RTI speech interventions for over a year through SSD, his articulation errors were significant enough to qualify him as eligible with a Sound System Disorder.

201.    Despite having received SSD reading services since May 2023, G.A. showed a

marked decline across all reading measures. On the Kaufman Test of Educational Achievement-3 (KTEA-3), G.A.'s composite score in Reading was SS 55, below the 0.1%. His Decoding composite was SS 60, at 0.4%. G.A. had regressed in his basic reading skills with SSD interventions.

202.    G.A.'s Reading Fluency composite was SS 56, below the 0.1% and a noted drop from his 2023 testing. SSD finally acknowledged that he met the eligibility criteria for SLD in Reading Fluency.

203.    G.A.'s Reading Comprehension composite was SS 82, at 12%. His Reading Understanding composite was SS 63, at 1%. SSD finally acknowledged that he met the eligibility criteria for SLD in Reading Comprehension.

204.    G.A.'s Written Language composite score was SS 50, well below 0.1%. His spelling was SS 40, also well below 0.1%. SSD finally acknowledged that he met the eligibility criteria for SLD in written expression. The drops in his written expression scores were drastic, as he was unsupported in this area of need for over 2 full years after he should have been found eligible for services.

## H. <u>Administrative Due Process</u>

205.    On May 14, 2025, Parents filed a Due Process complaint with the Administrative Hearing Commission, seeking private placement at public expense at Churchill School, a private dyslexia school, reimbursement for private testing and tutoring and related educational costs.

206.    At the time of the filing, Parents were not in possession of raw data collected or used to make the initial eligibility determination, PowerPoint presentations, internal emails, or other relevant discovery.

207.    The Districts declined to discuss private placement after receiving Parents' 10-

day letter. Rather, they proposed to continue the IEP with the same goals and services minutes and with the same teacher for the following year. As a result, Parents enrolled G.A. in Churchill school.

208.    The Commission's September 30, 2025 Decision after the Due Process Hearing is attached as **Exhibit A**.

<u>**COUNT I**</u>
**Failure to Provide Free and Appropriate Education**
*Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401 et seq.*
(De Novo Review of Administrative Decision)
(Against Defendants Rockwood and SSD)

209.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

210.    G.A. is a child with a disability as defined by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401(3)(A).

211.    SSD and Rockwood are Local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9). Although SSD is tasked with Special Education services, both districts provide educational services to G.A.

212.    Defendants failed to provide G.A. with a free appropriate public education (FAPE), in violation of IDEA and Missouri law, and the order and decision of the AHC should be reversed.

213.    From August 4-6, 2025, the Administrative Hearing Commission (AHC or Commission) held a hearing on the petition. The Commission framed Plaintiffs' issues as follows: (a) Whether Districts violated their Child Find obligations; (b) Whether Districts failed to provide an IEP that confers an educational benefit; (c) Whether Districts committed procedural violations of the IDEA relating to Parents' right to an IEE and parent participation; (d) Whether Districts failed to implement Student's IEP with fidelity; (e) Whether Districts

failed to implement specific interventions with fidelity; and (f) Whether Districts failed to provide necessary ESY services.

214.    The hearing was held via WebEx. The AHC placed significant time limitations on the presentation of evidence at the hearing over Plaintiffs' objections, impacting their rights.

215.    On September 30, 2025, the AHC decided the Plaintiffs failed to meet their burden to show the Districts' violated the IDEA. The AHC decided the Districts did not violate Child Find nor IDEA and denied all requests for reimbursement and tuition. Because the Commission found no violations, the opinion failed to discuss the appropriateness of the private placement or any of the remedies requested by Plaintiffs.

216.    The decision is deficient in that it mischaracterizes evidence, misstates facts in evidence, fails to consider evidence, and fails to address obvious evidentiary weaknesses.

A.  GLOBAL ERRORS IN FACT FINDING, EVIDENCE, AND LAW

    i.  The decision mischaracterizes evidence, misstates facts in evidence, fails to consider key evidence, relies on facts not in evidence, and fails to address obvious evidentiary weaknesses, then uses this flawed view of the record to deny relief.

    ii.  The Commission repeatedly made determinations that are wholly contrary to the weight of the evidence, including findings that Student's educational programming was appropriate despite an undisputed lack of meaningful progress.

    iii.  The decision misapplied controlling Supreme Court precedent, including *Endrew F. ex rel. Joseph F. v. Douglas Cnty Sch. Dist. RE-1*, 580 U.S. 386 (2017) and *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176 (1982), by effectively holding that Student did not need to make progress, that grade level progress was unattainable and therefore unnecessary, and that his lack of progress stemmed from limited "capacity" rather than from the Districts'

failure to meet its obligations under IDEA.

## B. EVIDENTIARY AND PROCEDURAL ERRORS

i. The Commission erred in admitting District Exhibits 121 and 161–164 while excluding Parent Exhibits 189–224, resulting in an incomplete and skewed record.

ii. Arbitrary and restrictive time limits, together with limits on witness examination, curtailed Parents' ability to present their case and amounted to a procedural denial of due process.

iii. The Commission held Parents to an elevated evidentiary standard, faulting them for not presenting additional expert testimony on dyslexia, dysgraphia, Wilson programming, and Extended School Year, while excluding relevant exhibits on the topics, treating District employees as experts, and accepting District documents as testimony without meaningful cross-examination.

## C. CHILD FIND, ELIGIBILITY, AND SCOPE OF DISABILITY

i. The Commission erred in finding that Student was not eligible for services under specific learning disability in reading fluency, reading comprehension, and written expression, and in holding that additional identifications in these areas would have had no impact on the services or instruction provided.

ii. The Commission erred in concluding that the Districts' failure to identify Student in these additional areas did not result in any loss of educational opportunity or benefit.

iii. The Commission erred in finding no violation of Child Find despite the Districts' failure to refer Student for a speech evaluation and failure to identify him as a student with a speech impairment.

iv. The Commission further erred in characterizing Student's lack of meaningful

progress in reading and writing as inevitable manifestations of his disability rather than as the result of the Districts' failures in identification, programming, and implementation.

D.  SUBSTANTIVE FAPE: READING, WRITING, PROGRAMMING, AND SERVICES

   i.  The Commission erred in concluding that the Districts designed and implemented IEPs reasonably calculated to enable Student to make progress in reading and writing, where the IEPs failed to address all areas of need adequately and failed to include goals related to reading fluency, reading comprehension, written expression, and spelling despite undisputed severe deficits in these areas.

   ii.  The Commission erred in determining that the Districts' use of the Wilson program, despite a complete lack of fidelity to its required procedures, adequately addressed Student's needs in reading and writing.

   iii.  The decision improperly accepted the Districts' assertion that they offered new or increasing interventions, that their programming was structured and based in research, and that these interventions were sufficient to address significant deficits in phonological awareness, decoding, fluency, comprehension, and written expression, despite the absence of improvement and evidence that programs were not used as designed.

   iv.  The Commission erred in conflating occupational therapy to address handwriting or letter formation with services in written expression and in finding that such handwriting services adequately addressed Student's severe deficits in spelling and the ability to express himself in writing.

   v.  The decision also erred in concluding that Student's IEP need not target grade level performance because learning to read or write on grade level was unreasonable or

unattainable for him, contrary to IDEA's requirement that goals be appropriately ambitious in light of the child's circumstances.

E.  IMPLEMENTATION FAILURES AND FIDELITY OF INSTRUCTION

i.  The Commission erred in finding that the District implemented Student's IEP as written and that Meyer provided research-based instruction with fidelity, despite service logs showing that approximately half of his service minutes in February were not delivered, the absence of any other service logs for the year, and evidence that interventions were not implemented as prescribed.

ii.  The decision minimized or mischaracterized evidence of lack of fidelity in Wilson and other reading interventions, including by treating fidelity failures as only a minor factor rather than a primary cause of Student's lack of progress.

F.  USE OF UNCERTIFIED STAFF AND UNSUITABLE PROGRAMMING

i.  The Commission erred in finding that the Districts' use of an uncertified Wilson teacher and the assignment of a Student who did not meet Wilson practicum requirements did not adversely impact him.

ii.  The Commission erred in determining that Student's ineligibility to be a Wilson practicum student did not bear on his suitability for instruction by an inexperienced instructor and that the lack of Wilson certification and fidelity did not cause or contribute to his lack of progress.

G.  METROEAST EVALUATION, IEE RIGHTS, AND REIMBURSEMENT

i.  The Commission erred in its treatment of the MetroEast evaluation, including misreading the report's service recommendations, minimizing its findings, and concluding that the Districts adequately considered the evaluation when the evidence showed little or no genuine consideration.

ii. The Commission erred in concluding that failures to consider the MetroEast evaluation were cured because some information was allegedly available from other internal sources.

iii. The decision erred in finding that Rockwood did not disagree with the SSD evaluation and that staff who directed Parents to seek outside testing had no corresponding obligation to inform them of their right to an independent educational evaluation or to provide information about that right.

iv. The Commission erred in denying reimbursement for the MetroEast evaluation, even though Rockwood staff expressly encouraged Parents to obtain it due to concerns about the adequacy of SSD's own evaluation.

H. PARENT PARTICIPATION, NOTICE, AND MISREPRESENTATION OF DATA

i. The Commission erred in determining that Parents were not denied the right to participate meaningfully in the development of Student's IEP, despite misrepresentations of progress, failure to disclose significant internal data, and failure to communicate the severity of staff concerns.

ii. The decision erroneously held that misrepresentations in Reading Success Plans, report cards, conferences, IEP meetings, and emails were overstated, that Parents were not deceived into believing their son was making progress, and that Parents' ability to advocate for some services and access to a limited set of samples cured the Districts' withholding of other essential data.

iii. The Commission further erred in reasoning that there was no procedural violation because Parents were not affirmatively denied information they did not know existed, and in finding that the failure to disclose major internal data and staff concerns did not significantly impede their opportunity to participate in decisions

regarding FAPE.

I. EXTENDED SCHOOL YEAR (ESY) ELIGIBILITY AND SERVICES

   i. The Commission erred in its ESY analysis by holding that ESY is required only to prevent regression, by finding Student ineligible for ESY, by concluding that Parents presented no evidence of eligibility, and by determining that the failure to provide ESY did not violate IDEA despite Student's profound and ongoing lack of progress in reading and writing.

   ii. The Commission further erred by requiring Parents to present additional expert testimony to prove ESY eligibility beyond the testimony of SSD witnesses who themselves described the ESY eligibility criteria and acknowledged facts that satisfied those criteria.

J. CAUSATION, CAPACITY, AND PROGRESS AT CHURCHILL

   i. The Commission erred in determining that Student's absolute lack of progress in reading and writing in the Districts' programs was the product of his lack of capacity rather than the result of inadequate identification, inappropriate programming, and failure to implement research-based interventions with fidelity.

   ii. The Commission erred in finding that Student made no meaningful progress in six weeks of summer school at Churchill and in using that finding to support the conclusion that his disability, rather than the Districts' programming failures, explained his lack of progress, despite testimony from Mother and Churchill staff to the contrary.

K. REMEDY: PRIVATE PLACEMENT AND REIMBURSEMENT

   i. The Commission erred in concluding that no violations of IDEA occurred and in holding that the record precluded a finding of denial of FAPE.

ii.  As a result, the Commission erred in denying reimbursement for private placement and other educational expenses, as well as reimbursement for the MetroEast evaluation, even though the denial of FAPE required compensatory relief and private placement was appropriate.

**COUNT II**
**Disability Discrimination**
*Section 504, Rehabilitation Act, 29 U.S.C. § 794 et seq.*
(Against Defendants Rockwood and SSD)

217.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

218.    G.A. is an individual with a disability and a student with a disability as defined by the Rehabilitation Act, 29 U.S.C. § 705.

219.    SSD and Rockwood are local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9), that receive federal financial assistance, and therefore constitute a program or activity covered by the Rehabilitation Act, 29 U.S.C. § 794. Although SSD is tasked with Special Education services, both districts provide educational services to G.A.

220.    Defendants, solely on the basis of G.A.'s disability, excluded him from participation in, denied him the benefits of, and subjected him to discrimination under a program or activity receiving federal financial assistance, in violation of 29 U.S.C. § 794(a).

221.    Defendants disregarded a strong likelihood that their treatment of G.A. would result in a violation of federally protected rights under Section 504 and thereby showed deliberate indifference to those rights.

222.    The Districts' actions discriminated against Student on the basis of his disability in violation of Section 504 when it:

A.    Denied him the opportunity to participate in or benefit from aids, benefits or services it offers others;

B.    Denied him the opportunity to participate in or benefit from aids, benefits or services that are equal to that afforded to others;

C.    Provided him aids, benefits or services that are not as effective as those provided to others;

D.    Unnecessarily provided him with different or separate aids, benefits or services;

E.    Otherwise limited him in the enjoyment of all the rights, privileges, and advantages and opportunities enjoyed by others receiving their aids, benefits and services;

F.    Deprived Student of an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement in the most integrated setting appropriate to his needs;

G.    Utilized criteria or methods of administration that have the effect of subjecting him to discrimination, or have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the programs or activities; and

H.    Determining the site or location of services in a manner that has the effect of excluding him, denying him the benefits of or subjecting him to discrimination under its programs or activities.

I.    Intentionally withholding and misrepresenting relevant educational information from Parents;

J.    Intentionally omitting testing in areas of suspected disability;

K.      Retaliating against Plaintiffs as they sought to enforce Student's rights by withholding important educational information, persistently refusing requests for documents, and refusing to utilize data, evaluations and other information to appropriately determine Student's educational needs and services.

223.   As a result of disability discrimination Student has been relegated to an inferior education program with fewer services, programs, activities, benefits and other opportunities, and an inferior status in the enjoyment of critical education services, resulting in educational, functional, communication, and social disadvantages in ways that diminish his current and future communication, health, independence, safety, self- esteem, relationships, dignity, productivity, satisfaction and well-being, in a direct affront to the purposes of federal special education and anti-discrimination laws.

224.   As a result of disability discrimination, Student has been significantly impeded in making progress towards the goals of equal opportunity, full participation, independent living, and economic self-sufficiency, contrary to the purposes of federal special education and anti-discrimination laws.

225.   As a direct result of disability discrimination Plaintiffs have expended private funds to provide evaluations of Student's disabilities and needs, as well special education and related services in an amount to be established at trial that the Districts should be ordered to pay.

226.   As a result of Defendants' conduct, Plaintiffs suffered injuries and actual damages in an amount to be established at trial that the Districts should be ordered to pay.

227.   Plaintiffs are entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

228.   Defendants acted in bad faith or with gross misjudgment in that their conduct

deviated so substantially from accepted professional judgment, practice, or standards as to demonstrate that they acted with wrongful intent.

229.    As a result of Defendants' conduct, Plaintiff suffered actual damages.

## COUNT III
### Disability Discrimination
*Americans with Disabilities Act (ADA), 42 U.S.C. 12131 et seq.*
(By. G.A. Against Defendants Rockwood and SSD)

230.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

231.    G.A. is a qualified individual with a disability under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2); see also 42 U.S.C. § 12102(1), (2); 28 C.F.R. § 35.108(b), (c).

232.    SSD and Rockwood are public entities within the meaning of the ADA. 42 U.S.C. § 12131(1)(B). Although SSD is tasked with Special Education services, both districts provide educational services to G.A.

233.    The Districts violated Plaintiffs' rights under Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq*.

234.    The Districts also violated different and independent procedural and substantive requirements of the ADA.

235.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

236.    Defendants excluded G.A. from participation in and denied him the benefits of the services, programs, or activities of a public entity and subjected him to discrimination, in violation of 42 U.S.C. § 12132.

237.    Defendants disregarded a strong likelihood that their treatment of G.A. would result in a violation of federally protected rights under the ADA and thereby showed deliberate indifference to those rights.

238.    The Districts' actions discriminated against Student in violation of 42 U.S.C. §12312 and 28 C.R.R. §35.130 when it:

A.    Denied Student the opportunity to participate in or benefit from the aid, benefit or service;

B.    Afforded Student an opportunity to participate in or benefit from the aid, benefit or service that was not equal to that afforded others;

C.    Provided Student an aid, benefit, or service that was not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

D.    Provided Student different or separate aids, benefits or services than provided to others and refused to provide him with aids, benefits or services as effective as those provided to others;

E.    Otherwise limited Student in the enjoyment of a right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit or service;

F.    Denied Student the opportunity to participate in services, programs, or activities that are not separate or different;

G.    Utilized criteria or methods of administration that had the effect of subjecting Student to discrimination on the basis of disability, and had the purpose or effect of defeating or substantially impairing accomplishment of the objectives of its program with respect to individuals with disabilities;

H.    Refused to make reasonable modifications to policies, practices or procedures when necessary to avoid discrimination on the basis of disability;

I.    Imposed or applied eligibility criteria that screen out or tend to screen out an individual or class or individuals with disabilities from fully and equally enjoying any service, program or activity;

J.    Retaliating against Plaintiffs as they sought to enforce Student's rights by withholding important educational information, persistently refusing requests for documents, and refusing to utilize data, evaluations and other information to appropriately determine Student's educational needs and services; and

K.    Failing to have adequate policies, procedures, protocols, training and oversight so as to ensure Student was not subject to discrimination.

239.   As a result of disability discrimination, Student has been relegated to an inferior education program with less services, programs, activities, benefits and other opportunities, and an inferior status in the enjoyment of critical education services, resulting in educational, functional, communication, and social disadvantages in ways that diminish his current and future communication, health, independence, safety, self- esteem, relationships, dignity, productivity, satisfaction and well-being, in a direct affront to the purposes of federal special education and anti-discrimination laws.

240.   As a result of disability discrimination, Student has been significantly impeded in making progress towards the goals of equal opportunity, full participation, independent living, and economic self-sufficiency, contrary to the purposes of federal special education and anti-discrimination laws.

241.    As a direct result of disability discrimination, Plaintiffs have expended private funds to provide evaluations of Student's disabilities and needs, as well special education and related services in an amount to be established at trial that the District should be ordered to pay.

242.    As a direct result of disability discrimination, Student has suffered injuries and damages in an amount to be established at trial that the District should be ordered to pay.

243.    As a result of Defendants' conduct, Plaintiffs are entitled to compensatory and emotional distress damages, injunctive relief, costs, and attorney's fees.

244.    Defendants acted in bad faith or with gross misjudgment in that their conduct deviated so substantially from accepted professional judgment, practice, or standards as to demonstrate that they acted with wrongful intent.

245.    As a result of Defendants' conduct, Plaintiff suffered actual damages.

**COUNT IV**
**Disability Discrimination**
*Section 504, Rehabilitation Act, 29 U.S.C. § 794 et seq.*
(By Stephen and Emily Arff as Against Defendants Rockwood and SSD)

246.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

247.    The Districts violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

248.    The District also violated different and independent procedural and substantive requirements of Section 504.

249.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

250.    Student is an individual with a disability and a student with a disability as defined by the Rehabilitation Act, 29 U.S.C. § 705. The remedies, procedures, and rights set forth in title

VI of the Civil Rights Act of 1964 are "available to any person aggrieved by any act or failure to act by any recipient of Federal assistance" under 29 U.S.C. § 794. 29 U.S.C. § 794a(a)(2). Parents are such aggrieved persons.

251.    SSD and Rockwood are local Educational Agencies (LEA) as defined by the IDEA, 20 U.S.C. § 1401(9), that receive federal financial assistance, and therefore constitute a program or activity covered by the Rehabilitation Act, 29 U.S.C. § 794. Although SSD is tasked with special education services, both districts provide educational services to Student

252.    Defendants, solely on the basis of Student's disability, excluded him from participation in, denied him the benefits of, and subjected him to discrimination under a program or activity receiving federal financial assistance, in violation of 29 U.S.C. § 794(a). Further, Parents were themselves denied meaningful participation as parents in Student's education, procedural safeguards and due process, all on the basis of Student's disabilities.

253.    Defendants disregarded a strong likelihood that their treatment of G.A. would result in a violation of federally protected rights under Section 504 and thereby showed deliberate indifference to those rights.

254.    As a result of Defendants' discriminatory actions, Parents have incurred injuries and damages including, but not limited to, significant expenses incurred in obtaining private services to address Student's educational needs as well as attorney's fees.

255.    Plaintiffs are entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

## COUNT V
## Disability Discrimination
*Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq.*
(By Stephen and Emily Arff as Against Defendants Rockwood and SSD)

256.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

257.    The Districts violated Plaintiffs' rights under Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq*.

258.    The Districts also violated different and independent procedural and substantive requirements of the ADA.

259.    The IDEA does not provide the exclusive remedy for violations of the educational rights of students with disabilities.

260.    Student is a qualified individual with a disability under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12102(1), (2); 28 C.F.R. § 35.108(b), (c).

261.    Parents are qualified individuals under the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4), due to their association and relationship with Student

262.    SSD and Rockwood are public entities within the meaning of the ADA. 42 U.S.C. § 12131(1)(B). Although SSD is tasked with special education services, both districts provide educational services to Student.

263.    Defendants excluded Student from participation in and denied him the benefits of the services, programs, or activities of a public entity and subjected him to discrimination, in violation of 42 U.S.C. § 12132.

264.    Defendants disregarded a strong likelihood that their treatment of G.A. would result in a violation of federally protected rights under the ADA and thereby showed deliberate indifference to those rights. Defendants discriminated against Parents, in that Parents have a relationship or association with Student *See* 42 U.S.C. § 12112(b)(4) (discrimination includes excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association); 28 C.F.R. § 35.150(g) (public entity shall not exclude or otherwise

deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.).

265.    As a result of Defendants' discriminatory actions, Parents have suffered injuries and damages including, but not limited to, significant expenses incurred in obtaining private services to address Student's educational needs as well as attorney's fees.

266.    Plaintiffs are entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

## COUNT VI
### Constitutional Violations
*Violations of First and Fourteenth Amendments and Retaliation, 42 U.S.C. § 1983*
(Against All Defendants)

267.    Plaintiffs incorporate and reallege all the foregoing paragraphs in this count.

268.    Defendants Rockwood and SSD are public school districts. Defendants Bolton, Kenkel, Krey and Buffington are employees and agents of the Districts and acted at all times relevant herein in accordance with official policy, ordinances, customs, and practices.

269.    The Special School District of St. Louis County (SSD) serves more than 23,000 students with disabilities across 22 partner districts and more than 250 schools, making it the largest provider of special education services in Missouri.

270.    Rockwood School District, an SSD partner district, enrolls approximately 20,000 students, with nearly 14 percent receiving services from SSD. The academic outcomes for students with disabilities in these districts reflect deep and pervasive literacy concerns.

271.    In the 2023–24 school year, nearly three-quarters of third-grade students with IEPs performed below the proficient level in English Language Arts, demonstrating only partial

or minimal command of the skills required to meet Missouri Learning Standards. Even students classified as "proficient" on state testing demonstrated no more than an adequate grasp of grade-level expectations.

272.    Both SSD and Rockwood are fully aware of these literacy failures. SSD maintains extensive and robust data-collection systems, giving it continuous access to student performance data across partner schools and placing it on unmistakable notice of widespread deficiencies in literacy outcomes.

273.    Rockwood personnel, mandatory participants in every IEP meeting, are equally responsible for ensuring their students are provided appropriate literacy instruction. Together, the two districts share an equal and significant role in the failure to provide this student with disabilities the instruction necessary for him to achieve meaningful progress in reading or writing.

274.    For example, in her role as the SSD administrator supervising special education at Fairway Elementary, Defendant Kenkel had full access to the district's literacy and progress-monitoring systems, attended weekly compliance meetings, and understood her responsibility to ensure that instruction, data collection, and IEP implementation met IDEA requirements. Despite this, Kenkel did not meaningfully review GA's IEP or data, did not verify what instructional methods were being used, and ignored district and state guidance on literacy and dyslexia. She was repeatedly informed by staff that G.A. was not receiving research-based reading instruction and was fully aware of his lack of progress, yet she failed to take corrective action, did not adjust his services after receiving a comprehensive outside evaluation, and participated in the denial of extended school year services for two consecutive summers. Rather than addressing the deficiencies, Kenkel managed messaging to Mother, restricted communication from staff, and approved the placement of GA with an uncertified Wilson

provider despite explicit warnings from literacy experts. She also limited discussion at IEP meetings, celebrated trivial test fluctuations while disregarding evidence of continued regression, proposed no new goals or services, and refused to consider private placement. In short, Kenkel had complete knowledge of GA's ongoing failure to make progress and of the instructional shortcomings identified by both staff and Mother, yet she took no steps to ensure that GA received an educational program reasonably calculated to enable progress.

275.    As SSD's chief of Teaching, Learning, and Accountability, and formerly as a literacy coach, Defendant Bolton exercised authority over the selection of literacy programs and the training of staff who delivered them. Acting under color of state law, she chose Wilson and other interventions, overseeing how they were implemented, and was responsible for ensuring that teachers received adequate training in fidelity protocols, including the requirements for practicum students. For years, she had access to SSD's own literacy data showing that these programs, as implemented, were not producing even minimal progress for GA and similarly situated students with disabilities. Despite this, Bolton disregarded the data, ignored Wilson's requirements for practicum placements and supervision, failed to ensure that Branson implemented the program with fidelity, and refused to make any meaningful changes to GA's programming.

276.    Yet, Defendant Bolton repeatedly insisted that SSD's existing literacy program and training were appropriate and that no changes were needed, even as G.A.'s reading and writing skills remained essentially stagnant. By using her official authority to maintain ineffective, poorly implemented programming in the face of clear evidence of failure, and by treating G.A.'s lack of progress as acceptable because of his disability rather than as a reason to correct and intensify instruction, Bolton acted with deliberate indifference to his rights.

277.    In her role as principal of Fairway Elementary, Defendant Krey supervised

Rockwood staff, oversaw general education programming, and served as a required participant in G.A.'s IEP meetings, attended regular MTSS meetings, and parent-teacher conferences. Through these responsibilities, Krey was fully aware of G.A.'s persistent failure to learn to read and write, the concerns raised by Fairway staff, and the extensive data showing his lack of progress. Rather than using her authority to insist on appropriate special education supports or to press SSD for effective, research-based instruction, Krey repeatedly—and falsely— reassured Parents that G.A. was progressing and meeting expectations, despite knowing that his scores and classroom performance showed otherwise. Krey attended meetings where his minimal gains were portrayed as success, endorsed that narrative, and did not demand that SSD's interventions or accommodations be adjusted to respond to his continued struggles. Krey also coordinated with SSD administrators, including Kenkel, and in May 2024 directed Rockwood staff to cease direct communication with Mother about GA, further limiting the flow of information to the family. Krey possessed but failed to share with parents reading assessments, spelling assessments, intervention records, and other documents, indicating a dire need for intensive services by a highly qualified special education teacher. In short, Krey had direct knowledge of GA's lack of progress and the serious concerns of her own staff, yet chose to maintain the appearance of progress, restrict communication, and take no meaningful steps within her authority as building principal to ensure that GA received appropriate and effective educational services under the IDEA.

278.    As the SSD school psychologist assigned to G.A., Defendant Buffington was a trained professional who knew that IDEA recognizes distinct learning disabilities in basic reading, reading fluency, reading comprehension, and written expression. Yet she chose to treat his basic reading diagnosis as an all-purpose explanation for his other difficulties and, on that basis, ignored and discounted data showing separate and significant impairments in

fluency, comprehension, and writing, as well as concerns regarding vision and motor functioning. By clinging to this narrow view in the face of contrary information, she did more than commit a professional error. She used GA's existing disability as a reason to withhold further identification and support that would have followed from an honest and complete evaluation, reflecting deliberate indifference to his actual needs and contributing to a discriminatory denial of equal access to the educational benefits available to other students.

279.    That deliberate indifference is evident in the way Defendant Buffington conducted and presented her evaluations. She skipped relevant subtests, produced an incomplete written report that omitted data supporting additional areas of eligibility, and prepared a PowerPoint for the eligibility meeting that contained false or misleading information and failed to alert Parents to the full extent of GA's deficits. At the eligibility meeting, she relied on this flawed presentation to minimize his academic and functional challenges and to predetermine the conclusion that no further areas of disability or services were warranted. When a comprehensive evaluation was finally performed in October 2025, it confirmed that GA's deficits in reading fluency, comprehension, written expression, and related areas had grown significantly. The earlier failure to identify and document his full areas of eligibility prevented the team from writing an appropriate IEP or providing necessary services in those domains. As a result, G.A. effectively lost two years of IEP services in multiple critical areas and sustained concrete educational harm.

280.    Defendants' further pre-determined to exclude Plaintiff G.A. from special education services in violation of the Fourteenth Amendment's Due Process and Equal Protection guarantees. Defendants' determinations were motivated by the Defendants' concern that too many IEPs and/or 504 Plans were being written for disabled children in their districts, and that they wished to reduce the number of such services offered to disabled children in the

districts to avoid scrutiny and expenditures, so they arbitrarily denied services to G.A. Therefore, G.A.'s disabilities were the motivating factor(s) for the denial of equal services and accommodations.

281.    The Districts' failure to train and supervise its employees was a direct result of a deliberate and conscious choice by the Districts to be indifferent to the constitutional rights of the G.A. Plaintiff G.A. was treated differently by defendants, including the district. Defendants treated similarly situated peers of G.A. More favorably with regard to the provision of reading intervention services by fully certified staff, resulting in G.A. being unable to enjoy the benefits of public education.

282.    Defendants retaliated against Plaintiffs' for exercising their constitutional rights, including their First Amendment Rights to petition for redress and Due Process under the IDEA when they acted in concert to conceal and misrepresent data and G.A.'s education progress, and when they conspired to not communicate with Parents, and then refused to work with Parents when they filed for Due Process—all behaviors designed to chill Plaintiffs' constitutionally protected activities.

283.    As a result of Defendants' conduct, Plaintiffs suffered actual damages, including, but not limited to, significant expenses incurred in obtaining private services to address Student's educational needs as well as attorney's fees. Plaintiffs are entitled to compensatory and emotional distress damages, equitable relief, costs, and attorney's fees.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request the following relief:

a.    The Court find that the Districts violated the child-find provisions of IDEA;

b.    The Court find that the Districts failed to provide a Free and Appropriate Public

Education under the IDEA;

     c.     The Court order compensatory educational services for G.A. for the entire duration of the violation;

     d.     General, specific, economic, emotional distress, pain and suffering, and exemplary damages;

     e.     Equitable and injunctive relief;

     f.     Costs, expenses, and reasonable attorneys' fees;

     g.     Pre- and post-judgement interest; and

     h.     Other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.


Dated: November 14, 2025          Respectfully submitted,

                               By: /s/ Diane Dragan
                               DRAGAN LAW FIRM, LLC.
                               10805 Sunset Office Drive Ste 210
                               St. Louis, MO 63127
                               Diane@Draganlawfirm.com
                               Ph: (314)788-7323

                               Attorney for Plaintiffs

# Exhibit A



# ADMINISTRATIVE HEARING COMMISSION OF MISSOURI

STEPHEN AND EMILY ARFF,　　　　　)
in the interest of G.A.,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Petitioners,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　)　　　　No. 25-0690
　　　　　　　　　　　　　　　　　　)
ROCKWOOD R-VI SCHOOL DISTRICT and )
SPECIAL SCHOOL DISTRICT OF　　　　)
ST. LOUIS COUNTY,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Respondents.　　　)

## DECISION

We find the Special School District of St. Louis County (SSD) and Rockwood R-VI School District (Rockwood) (collectively, the Districts) did not deny G.A. (Student) a free and appropriate public education (FAPE) or fail to comply with the obligation to identify Student as a child with a disability. Likewise, the Districts did not violate the procedural safeguards required by the Individuals with Disabilities Education Act (IDEA) involving parent participation or the right to an independent educational evaluation (IEE). Accordingly, we deny Stephen (Father) and Emily (Mother) (together, Parents') request for compensatory education, reimbursement for prior tutoring and evaluations paid for by Parents, and reimbursement for private placement.

## Procedure

On May 14, 2025, Parents filed a due process complaint on behalf of Student against the Districts. On June 18, 2025, Parents filed an unopposed motion to continue the hearing and extend decision deadlines. On June 20, 2025, we granted Parents' motion and continued the

hearing date to August 4-5, 2025, with a decision due on September 8, 2025. We allotted 7 hours for each party to present their cases.

On August 4-6, 2025, we held a hearing. To permit Parents additional time to present their case, we extended the hearing a third day. Parents were represented by Diane L. Dragan of the Dragan Law Firm, LLC. SSD was represented by Bethany M. Kirk and Abbey S. Widick of Mickes O'Toole, LLC. Rockwood was represented by Julie Z. Devine and Alexandra S. Sievers from Lashly Baer, PC. On August 6, 2025, during the hearing, Petitioner moved for an extension of the briefing schedule and decision deadline in order to provide additional briefing on evidentiary issues; we granted the motion. On August 11, 2025, we issued an order with rescheduled briefing timelines discussed and a new decision date of September 22, 2025. On August 26, 2025, following a joint motion for extension of the briefing and decision deadlines, we issued an order extending the decision deadline to September 25, 2025. On September 5, 2025, following a joint motion for extension of the briefing and decision deadlines, we issued an order extending the decision deadline to October 1, 2025. The case became ready for our decision on September 8, 2025, when the parties filed their final written briefs.

### Findings of Fact

<u>Background Information</u>

1.      At the time of Parents' due process complaint, Student was 9 years old and enrolled in third grade at Fairway Elementary School (Fairway) in Rockwood.

2.      Student is well-liked by teachers and classmates. He has many friends, demonstrates creativity, enjoys sports, and is generally excited about school and learning.

<u>Early Education and Interventions</u>

3.      During preschool in 2018-2019, Rockwood identified Student as a child with a disability under the category of speech impairment – sound system disorder and implemented an IEP with 60 minutes of weekly speech therapy.

4.      During the 2019-2020 school year, following a re-evaluation and review of existing data (RED), Student's IEP team found he no longer qualified for special education services. Parents reported no health concerns and staff reported no observed concerns.

5.      In kindergarten, the 2021-2022 school year, Student took the STAR Early Literacy test, a standardized test given to students three times periodically during kindergarten. Student scored in the 82nd, 96th, and 92nd percentile on his three tests.

6.      Also in kindergarten, Student took the Wechsler Preschool and Primary Scale of Intelligence – Fourth Edition (WPPSI-IV). Student's scores indicated "superior" general ability with a composite score of 121, placing him in the 92nd percentile of test takers. Student's composite subscores are reflected as follows:

| Scale | Percentile |
|---|---|
| Verbal Comprehension | 97 |
| Fluid Reasoning | 87 |
| Full Scale IQ | 92 |
| Non-Verbal | 86 |
| General Ability | 92 |

7.      Student exhibited struggles with reading and began instruction with Fairview's reading intervention teacher, Becky Schuller. Student received reading intervention instruction

for 30 minutes each day. Schuller observed that Student struggled to learn and apply phonemes and phonics skills, meaning that he struggled to segment and blend sounds together into words.

8.   Schuller utilized an intervention called Leveled Literacy Intervention (LLI). While in LLI, Student completed reading benchmark assessments. The benchmark assessments are segmented into lettered levels with levels A-D representing the beginning, middle, and end of appropriate kindergarten reading levels. Student reached level B on these assessments – equivalent to a mid-kindergarten level. Student reached, but failed to complete, level C.

9.   Fairview provides reading intervention to students who struggle with reading, but the intervention is not limited to students with IEPs and it is not considered special education.

<u>First Grade – 2022-2023</u>

10. From first grade onward, Student took the STAR Reading Assessment and STAR Math Assessment, standardized tests of academic performance, three times per year at Rockwood.

11. Student performed poorly on the STAR Reading Assessment with scores in the 2nd, 1st, and 1st percentiles during the Fall, Winter, and Spring, respectively. His scores indicated he began the school year two grade levels behind his average peers and fell further behind as the school year progressed.

12. By contrast, Student performed very well on the STAR Math Assessment with scores in the 97th, 87th, and 99th percentiles during the Fall, Winter, and Spring, respectively.

13. Due to his reading struggles, Student continued to receive reading intervention with Schuller for 30 minutes a day.

14. From the beginning of first grade through October 1, 2022, Student continued LLI instruction with Schuller, but still failed to progress beyond level C. On October 2, 2022, Student switched to a new intervention program called Phonics First, a program focused on teaching

phonemes – the sounds that a letter or letters make. Phonics First also contains instruction on sight-words (or high-frequency words) and consonant-vowel-consonant (CVC) words like "cat," "dog," etc.

15. Throughout first grade, Student continued to struggle with reading and writing. On January 20, 2023, Rockwood implemented a "reading success plan" for Student. The reading success plan focused on decoding and writing words with short vowels, consonants, and digraphs. The plan noted that:

> [Student] can identify almost all letters and sounds and can recognize the beginning and ending sounds in words. He has made a lot of growth in blending, segmenting and decoding CVC words, however, consistently identifying sight words is still hard for him. Please continue practicing the sight words that are in his pouch with him, this will aid in improving his sight word vocabulary. [Student] learns best with multi-sensory activities so we will continue progressing through Layer 1 of Phonics First next semester.

16. Schuller recognized that Student was not progressing in reading and writing and shared her concerns with Rockwood staff. In an e-mail sent on January 23, 2023, Schuler noted that Student still read at level B and discussed his performance before concluding, "I am very concerned about him."[1]

17. In February 2023, Rockwood referred Student for a special education evaluation with SSD in the areas of reading and written expression. SSD determined that further testing was required and sent Parents a prior written notice for an initial evaluation on March 6, 2023. The notice contained a procedural safeguards statement which noted that parents of children with disabilities have protections under Part B of the IDEA and provided instructions for accessing

---

[1] Pet. Ex. 10 at 1.

"The Procedural Safeguards Statement for Parents and Children and The Parents' Bill of Rights[.]"[2]

18. As part of his initial evaluation, in late April and early May 2023, Student completed a battery of tests including the Wechsler Intelligence Scale for Children-5th Edition (WISC-V), Kaufman Test of Educational Achievement-3 (KTEA-3), and Woodcock-Johnson IV Tests of Achievement Form A (Woodcock-Johnson). Additionally, Parents completed a checklist of possible concerns, and staff observed Student in the classroom.

19. Student scored as follows on WISC-V:

| Scale | Standard Score (Mean 100; Average 90-109) |
|---|---|
| Verbal Comprehension Index | 121 |
| Visual Spatial Index | 132 |
| Fluid Reasoning Index | 115 |
| Working Memory Index | 82 |
| Processing Speed Index | 98 |
| General Ability Index | 125 |
| Full Scale IQ | 117 |

20. Student scored as follows on the KTEA-3:

| Scale | Standard Score (Mean 100; Average 90-109) |
|---|---|
| Composite – Reading | 72 |
| Composite - Written Language | 67 |
| Composite - Sound-Symbol | 81 |

---

[2] Joint Ex. 11 at 4.

| Composite – Decoding | 73 |
| Subtest - Letter & Word Recognition | 69 |
| Subtest - Nonsense Word Decoding | 79 |
| Subtest - Reading Comprehension | 76 |
| Subtest - Silent Reading Fluency | 74 |
| Subtest - Written Expression | 71 |
| Subtest – Spelling | 67 |
| Subtest - Phonological Processing | 89 |

21. Student scored as follows on the Woodcock-Johnson:

| Scale | Standard Score (Mean 100; Average 90-109) |
|---|---|
| Cluster - Basic Reading Skills | 68 |
| Test - Letter-Word Identification | 60 |
| Test - Word Attack | 78 |

22. After the Districts completed their evaluation of Student, they convened a meeting on May 8, 2023. Parents participated in the meeting along with representatives from the Districts, Schuller, Student's other teachers at Fairview, and school psychologist Brandi Buffington.

23. Buffington led the May 8, 2023 meeting with a slide presentation. The presentation showed Student's test scores, a summary of observations and teacher input, and the criteria for Specific Learning Disability (SLD). The slide show contained one typographic error that incorrectly listed Student's silent reading fluency from the KTEA-3 as 86 instead of 74. The

slide omitted Student's composite written expression score of 67, but did include the written expression subtest score of 71.

24. The IEP team determined that Student met the criteria for eligibility as a child with a disability with a SLD in basic reading. Student's IEP team discussed Student's issues with reading, written expression, and fluency, but agreed that basic reading was the cause of these related reading problems. The team did not specify any other criteria as a basis for his SLD diagnosis.

25. On May 22, 2023, Student's IEP team met to determine services Student would receive. The IEP team noted that Student's disability impacted his academic performance with respect to his ability to "blend sounds together to decode unfamiliar words." Mother echoed this conclusion, expressing concerns that Student struggled to consistently identify letters and words.[3]

26. With regard to the baseline data the IEP team reviewed, they wrote:

> [Student] was assessed with The Kaufman Test of Educational Achievement, Third Edition (KTEA-III) on 5/1/23, this assessment revealed [Student's] Phonological Processing skills were low average. He was able to blend words, match sounds (not automatic though), and segment words. He could identify rhyming words but he couldn't produce any. He also struggled to delete sounds from words. [Student's] ability to decode nonsense words was below average and his ability to decode real words was low. He struggled with word reversals and vowel sounds. His ability to independently read passages and answer questions about them was below average; however, this was significantly impacted by his weak decoding skills. [Student's] silent reading fluency skills were below average. [Student] was also assessed using The Woodcock-Johnson Test of Academic Achievement - Fourth Edition (WJ-IV Ach) on 5/1/23, revealing: Basic Reading Skills cluster is a combination of Letter-Word Identification (reading a list of words aloud) and Word Attack (reading nonsense letter combinations that are phonetically consistent or regular patterns in orthography). These tests measure sight word vocabulary, the application of

---

[3] Joint Ex. 40 at 2.

phonics and structural analysis skills. [Student's] score of 68 on this cluster is very low. [Student's] Letter-Word Identification score of 60 was very low, and his score of 78 on Word Attack was low. First grade students are expected to end the year reading at an independent level G, according to [Student's] most recent BAS assessment he is reading at an independent level D.[4]

27. The IEP team noted Student's performance in classwork and District assessments. Specifically, they considered Student's STAR math and reading results; FastBridge reading assessments in letter naming, nonsense words, sight words, word segmenting, and passage reading; and Phonics First performance.

28. The IEP drafted goals for Student, both of which were targeted towards Student's struggles with basic reading. Student's IEP goals were:

Goal 1: By May 20, 2024 when given a list of 20 words with grade appropriate letter patterns CVC, CCVC, CVCC, and CVCE words (e.g., can, trim, pond, hope), [Student] will increase his basic reading skills by identifying each sound in the word and blend the sounds together to correctly read the word aloud, for 15 out of 20 words as measured by progress monitoring probes and oral reading samples.

Goal 2: By May 20, 2024 when given a list of with 30 priority, high-frequency words, [Student] will increase his basic reading skills by correctly reading the words aloud with fluency, for 20 out of 30 words as measured by progress monitoring samples and reading records[5]

29. For services, Student's IEP provided for 90 minutes of special education instruction in reading weekly. Student would receive the remaining 95% of his instruction in a regular education setting. Student received accommodations to participate in regular education. Specifically, Student's non-reading tests and assignments would be read aloud to him over multiple sessions with breaks as needed and extended time. Additionally, Student would receive

---

[4] *Id*. at 2-3.
[5] *Id*. at 7.

lower difficulty level assignments. Student's teachers were instructed to give oral cues or prompts for assignments, adapt worksheets, and frequently check with Student for understanding and review of course material.

30. The team determined Student did not require extended school year (ESY) services but stated it would make that determination by January 31, 2024. The Districts' ESY runs from June 2 to June 27.

31. During the IEP meeting, Mother expressed concern that Student might require occupational therapy for his handwriting. After the meeting, Buffington spoke with an occupational therapist who worked within the Districts about referring Student for an evaluation. The request was declined because Student's handwriting problems like line adherence and letter reversals were not atypical for students his age. The Districts provided Parents with IDEA procedural safeguards.

<u>Second Grade – 2023-2024</u>

32. Student returned to Fairview for second grade. His classroom teacher was Quinn Peterson. Kayla Meyer implemented Student's 90 minutes of weekly special education instruction in basic reading. Additionally, Student continued receiving reading intervention in a regular education setting with reading intervention teacher Lauren Fish, who replaced Schuller following her retirement. Fairview's reading intervention program is considered a separate service from special education provided by SSD. In coordination with Meyer, Fish obtained special permission to continue working with Student for 150 minutes per week because she felt Student required extra support.

33. Fish has 21 years of teaching experience. She is trained to provide reading interventions for struggling students including Phonics First and LLI. Fish observed Student to be social, kind, and happy. She considered him very bright with strong verbal language and

conversation skills. Prior to working with Student, Fish knew Student struggled with reading and specifically learning and applying phonemes and phonics skills – essentially Student could not segment sounds and blend them together into words. Fish was aware of Mother's concerns with Student's reading and frequently consulted with her on Student's reading interventions

34.  Throughout second grade, Student's reading achievement did not significantly improve, and Student once again tested in the 1st percentile on all correctly implemented STAR Reading Assessments. Student received an aberrantly high score on his Winter STAR Reading Assessment due to a mistake Meyer made while implementing the test. This score did not reflect Student's actual reading ability. Student's STAR scores indicated that he had made no progress relative to his peers in reading as the year went on.

35. Conversely, Student progressed well in math achievement as evinced by his STAR math scores. In the fall, Student regressed significantly on his STAR Math test, scoring in the 36th percentile. After implementing test accommodations to account for his poor reading, Student's STAR math scores improved dramatically, and he scored in the 82nd and 97th percentile in the winter and spring, respectively.

36. For his reading intervention instruction, Fish continued to use the Phonics First program that Student began in first grade. Fish coordinated with Meyer to make sure her instruction did not overlap or interfere with Student's specialized education minutes. Since Fish had been trained in the Phonics First program, she focused on providing phonics instruction while Meyer focused on sight words and decoding CVC words. Fish taught Student for 30 minutes a day and timed her instruction to interfere as little as possible with other classroom work.

37. In Peterson's classroom, Student would sit close to her so she could provide immediate help or extra prompting when needed.

38. Meyer was a first-year special education teacher when she worked with Student. She worked with an experienced mentor throughout the year. Previously, she had worked as a substitute teacher in special education. Meyer worked with Student in a small group with two other students for 90 minutes a week. Meyers received multiple trainings during her first year as a teacher.

39. Meyer taught Student using evidence-based strategies from the Florida Center for Reading Research and other programs targeting his basic reading goals.

40. Meyer did not keep reliable records of her service minutes with Student. A record from February showed that she provided services for Student on February 6, 14, 21, and 28, 2024, for 30 minutes each session. Meyer recorded Student's progress on progress reports. She kept raw data for Student's reading in a binder but did not maintain it.

41. On September 1, 2023, Fairview's speech language pathologist, Pamela Esker, reached out to Mother and asked if she wanted to discuss occupational therapy testing for Student.

42. On September 13, 2023, Esker emailed Student's teacher, Peterson, and expressed concern that Student exhibited errors on his spoken /r/ sound. She stated that she could not implement a speech intervention until mid-November because Student would not turn 9 until May and asked if it would be okay to reach out then.

43. On September 25, 2023, Student's IEP team began a RED concerning Student's fine and visual motor skills. Particularly, Parents and Student's teachers had noticed problems with his legibility, line adherence, and spacing while writing.  The IEP team recorded that "Students in 2nd grade are expected to be able to use grade-level appropriate paper to produce printed letters, words, and sentences with proper proportion, size, and spacing." Additionally, students

were expected to write "uppercase and lowercase letters legibly in manuscript, minimal rotations or reversals after age 8."[6]

44. The IEP team conducted interviews with Student's teachers, performed an informal handwriting assessment, implemented the Wide Range Assessment of Visual Motor Ability (WRAVMA), and conducted an occupational therapy assessment.

45. Student performed above average on the WRAVMA, indicating no issues with visual motor abilities. Similarly, Student performed well on occupational therapy evaluations related to postural stability/control, non-writing fine motor control, and gross motor coordination. Despite the absence of any intrinsic problems with motor skills, Student consistently reversed letters and failed to adhere to lines while writing. These evaluations suggested that Student's writing struggles did not stem from fine or visual motor skills.

46. In mid-fall, Fish had a conversation with Mother in which she recommended possibly having Student tested for dyslexia, because "it might give us more information on how [Student] learns best as a child that is having these types of struggles."[7] However, Fish qualified her recommendation by saying that a dyslexia diagnosis would not necessarily lead to a change in services. Fish had previously noticed signs of dyslexia like letter reversals when Student was in first grade, but at the time, those reversals were age appropriate. Mother asked for resources for dyslexia testing, and a school counselor emailed her resources for dyslexia testing at the University of Missouri – St. Louis and Metro East Therapy (Metro East). Fish was not familiar with the procedures for an independent educational evaluation (IEE), so she did not recommend Parents request one.

---

[6] Joint Ex. 49 at 12.
[7] Tr. I at 73.

47. On October 2, 2023, Mother sent an e-mail to Dyslexia St. Louis asking about dyslexia testing for Student.

48. Student never advanced past level 1 of Phonics First's four levels. Fish observed only incremental progress, and Student struggled to apply skills he learned in lessons to new words.

49. On November 6, 2023, Fish sent an email to administrative staff at Fairview asking to allocate time to discuss "major concerns" she had with Student's reading.[8] Additionally, Fish arranged for staff to read Student's STAR Math assessment aloud to him for a more accurate result.

50. Fish then met with Rockwood's literacy coach to discuss Student's lack of progress. She noticed only slight growth in Student's segmenting and blending skills. Fish and the literacy coach decided to implement a new reading intervention called SIPPS, another phonics resource with transitions in the lesson and more direct prompting than Phonics First. Fish believed Student would benefit from these features and might respond positively to a change. Fish had eight years of experience teaching SIPPS and underwent refresher training prior to working with Student. Both Phonics First and SIPPS contained components targeting phonemic awareness.

51. In Fish's understanding, both Phonics First and SIPPS were research-based interventions for phonics. In her understanding, her instruction was filling this need instead of through SSD instruction with Meyer.

52. Fish began implementing SIPPS for Student on November 10, 2023. Fish began Student at the SIPPS "Extension Level" as recommended for second or third grade students, but Student could not complete the lesson, so she continued instruction at the SIPPS "Beginning

---

[8] Pet. Ex. 31.

Level" for kindergarten, first grade, or older students who could not complete the Extension Level.[9]

53. In internal discussions with other District staff, Fish opined that Student had one of the more severe cases of dyslexia that she had seen in her 21 years of teaching, but felt that SIPPS was still working, because he was meeting his early goals for the program.

54. On November 30, 2023, Student underwent testing for dyslexia at Metro East. Student took a battery of tests including the Test of Integrated Language and Literacy Skills (TILLS), Gray Oral Reading Tests-Fifth Edition (GORT-5), Test of Word Reading Efficiency-Second Edition (TOWRE-2), and Rapid Automatized Naming & Rapid Alternating Stimulus Tests (RAN/RAS). Additionally, Metro East performed an analysis of a writing sample taken from Student.

55. On the TILLS, a test of oral and written language, Student scored below the 1st percentile in sound/word and sentence/discourse composite scores. [10] These scores reflected "low ability in the areas of phonology and word structure knowledge" and "average low in the areas involved in language comprehension and formulation[,]" respectively.[11]

56. On the GORT-5, a test of oral reading skills, Student scored below the first percentile in rate, accuracy, fluency, and comprehension – all of the areas tested.

57. On the TOWRE-2, a test of an individual's ability to pronounce words accurately and fluently, Student scored below the first percentile in sight word efficiency, the 2nd percentile in phonemic decoding efficiency, and first percentile in the total word reading efficiency index.

---

[9] Joint Ex. 59 at 5.

[10] The TILLS test is unusual in the sense that percentile scores of "0%" are possible and given when students in the normative sample scored lower than the student with a language/literacy disorder. For sentence/discourse, Student's percentile was listed as both "0%" and "40th." Pet. Ex. 33 at 3.

[11] *Id*.

58. On the RAN/RAS, a test of ability to perceive visual symbols and name them accurately and rapidly, Student scored in the 5th percentile for objections, 10th percentile for colors, 5th percentile for numbers, 6th percentile for letters, 12th percentile for 2-set letters and numbers, and 5th percentile for 3-set letters, numbers and colors.

59. Student attempted to write a writing sample, but his extremely poor spelling made his writing unintelligible, and the sample could not be scored.

60. Based on this testing, Metro East concluded that Student's profile was "consistent with dyslexia and disorder of written expression characterized by deficits at the sound/word level of written language, but strengths at the sentence/discourse level of spoken and written language."[12] The team noted that its tests "cannot reliably measure [Student's] reading comprehension skills as much of his cognitive stamina is being reserved to accurately decode words, and, because this skill is so rigorous for him, he resorts to reading graphic/phonemically with little regard for context or meaning." With respect to writing specifically, the "physical act of writing was very difficult" for Student, and he had "large spaces between his words, poor line adherence, and even poorer letter formation. Challenges associated with both the linguistic and motor aspects of writing would warrant a diagnosis of dysgraphia[.]"[13]

61. Metro East made many recommendations for Student's education. Generally, Metro East recommended:

> Classroom goals and instruction must be systematic and explicit. Classroom instruction needs to focus both on the Science of Reading and Writing approach to instruction. In other words, while [Student] needs support in the form of repetition, review, and scaffolding, he needs to be provided daily, explicit instruction using a structured literacy program and support needs to be extended into writing.[14]

---

[12] Pet. Ex. 33 at 8.
[13] *Id*. at 10.
[14] *Id*. at 12.

62. Specifically, Metro East recommended:

- Participate in a structured literacy program, like Orton Gillingham, at least 2x/week for 60 minutes. Structured literacy approaches systematically and explicitly teach children how to decode and encode.
- Children with dyslexia, especially at [Student's] age, need more instructional support for word-level reading than just phonics and phonemic awareness. [Student] will need to participate in activities to help develop stronger orthographic and morphological awareness skills. These may include word sorts, word studies, or semantic maps.
- Participate in writing/scribing tasks that help [Student] learn strategies and how to use tools to help him plan, develop, revise, and edit his work. It is important to note that writing is a process, and there are specific elements within writing that can, and should, be targeted individually in their contrived form. Furthermore, if [Student] has not developed a skill in spoken form, he will not be able to utilize this skill in written form. Writing is critical to target as children with dyslexia may develop stronger decoding skills, but without simultaneous writing instruction, writing will continue to lag. It is a misconception that writing should be targeted after reading skills have more fully developed. Specifically:
    - [Student] will use age- appropriate punctuation including commas and periods.
    - [Student] will utilize a graphic organizer to help with the thought development/planning stage of writing. Clear examples and models are recommended.
    - [Student] will learn the writing process through use of a scribe.
- Classroom teacher/s also need to pay careful attention to vocabulary instruction. Tier II vocabulary must be carefully and thoughtfully selected from [Student's] classroom and can also be targeted during language therapy using [Student's] curriculum. Research has found several effective ways of teaching vocabulary including:
    - Using small groups to discuss words and be "word detectives"; this promotes meaningful dialogue and can increase perspective taking skills.
    - Use of semantic maps
    - Use of a ranking system for students to identify how well they know and understand words.
    - Use of Semantic Feature Analysis
    - Explicit morphological instruction (e.g., root words, prefix, suffix)
    - Please note that word searches, writing out definitions of words, or crossword puzzles, as examples of passive activities, are not effective vocabulary instruction and lack opportunities for children to interact with words on a deeper processing level necessary for understanding.
- Continue to encourage and promote an environment where [Student] can thrive from a social/emotional standpoint. Research has shown that children who have strong teacher support where they are viewed as equally as capable as their peers but are allowed to access information in ways that are most attainable for them, report the highest feelings of self-worth and efficacy. Children, however, that are made to feel "lazy" or "dumb" report feelings of anxiety, depression, and in-general feel less motivated than their nondyslexic peers. [Student] will need to continue to have strong advocates, both in school and at home, so that he continues to be motivated to work hard to meet academic

goals. Teachers and staff need to also be aware that the features of dyslexia that are impacting reading will be prone to impacting other academic areas; caution is advised against presuming that dyslexia is only "reading disorder."

- Classroom teachers should consider Bloom's taxonomy when attempting to determine whether or not [Student] has learned a new concept. He will demonstrate a deeper and more vast knowledge of a topic when he is allowed to demonstrate, create, or show versus when he is being asked to memorize and regurgitate information; formative assessment is recommended.
- Consider a second opinion to look more closely at [Student's] handwriting skills within the context of literacy as this seems to be a significant factor in his ability to write for meaning. Documented visual/motor deficits in writing in conjunction with poor written expression are consistent with a diagnosis of dysgraphia.[15]

63. Metro East also made general recommendations for accommodations in the classroom including:

- Allow for testing in a quiet environment
- Tests read aloud
- Allow access to audiobooks
- Not penalized for errors related to spelling or copying
- Not called to read aloud in class unless volunteers
- Alternative/modified assignment when reading or writing requirements exceed zone of proximal development
- Assignments of reduced length/fewer problems to complete
- Frequent check-ins to ensure comprehension
- Reduced spelling list (no more than 8 words) or alternative spelling test that coincides with structured literacy concept
- Access to a scribe
- Allow verbal responses to test[16]

64. On January 24, 2024, Parents received Metro East's evaluation report and forwarded it to the Districts.

65. On January 31, 2024, the Districts amended Student's IEP to determine he was eligible for ESY services in reading.

66. In February 2024, Parents hired a private tutor at Dyslexia St. Louis to work with Student. Student's private tutor utilized a system called "Orton-Gillingham," which Mother

---

understood to be the "gold standard" for teaching children with dyslexia. To accommodate Student's extra-curricular activities, Parents withdrew him from school 10 minutes early to attend his 45-minute private tutoring sessions.

67. By February 9, 2024, the Districts had begun internally considering possible writing goals implemented through an occupational therapist.

68. On February 23, 2024, the Districts sent Parents prior written notice of proposed changes to Student's IEP. The new IEP provided 30 minutes of weekly occupational therapy described as a new area of need and created the following goal:

> By 5/20/2024, given adapted paper and use of a visual checklist as needed, [Student] will increase his motor planning skills by completing written work legibly with 80% accuracy for line use and no more than 2 reversals, on 2/3 consecutive data days as measured by work samples.[17]

69. On March 6, 2024, Esker emailed Mother and informed her that she would begin seeing Student once a week to work on his spoken /r/ sound. In Mother's opinion, Student did not have "a huge speech deficit."[18] However, she was happy that Student was receiving the speech intervention.

70. On March 14, 2024, a parent-teacher conference was held. During the conference, Parents expressed frustration at Student's lack of progress and stated that Student needed to begin receiving instruction using the Wilson Reading System (Wilson), an intervention program utilizing Orton-Gillingham.

71. Wilson is an intensive support system for teaching student to decode and spell. It also targets comprehension and vocabulary. It can be implemented in groups or one-on-one. Wilson

---

[17] Joint Ex. 69 at 9.
[18] Tr. III at 87.

also addresses related reading problems like phonological awareness, reading comprehension, decoding, fluency, and writing.

72. On April 17, 2024, the Districts convened an IEP meeting. The IEP team discussed Parents' concerns related to his recent dyslexia diagnosis. The IEP team noted Student's performance on STAR Math and Reading assessments from the Fall, Winter, and Spring of the school year.

73. Student failed to meet either of his basic reading goals. Regarding Goal 1, Student could only accurately decode an average of 10 out of 20 CVC words. Regarding Goal 2, Student was only able to accurately read an average of 11 out of 30 high-frequency words with fluency. For his new occupational therapy goal, the IEP team wrote:

> This goal was recently implemented in February 2024. From data collected in April 2024, [Student] self-produced multiple sentences on bolded triple lined paper with a range of 0-6 reversals per data day. Most common reversals include 4, S, and P. [Student] is able to fix all errors independently using a visual checklist to check for reversals. His handwriting is legible and line use is at 76% accuracy, and he benefits from continued use of adapted bolded lined paper. Spelling errors can make it difficult to read his writing, but his fine motor mechanics are appropriate. [Student] is able to near-point copy sentences on bolded triple lined paper with 85% for legibility and zero reversals. He has difficulty with reversals when producing written work more than with copying written work.[19]

74. Following the meeting, the Districts implemented a new IEP. The IEP maintained the same service minutes and goals as its last amended version in April 2024. Parents' request for Wilson was not included in the IEP.  The IEP team found Student no longer qualified for ESY services. The IEP team found Student did not require assistive technology.

---

[19] Joint Ex. 75 at 4.

75. One day in April 2024, Student began to cry out of frustration while working on reading with Fish, and she observed Student crying in the hallway on another occasion. Fish called Mother to report the incidents, because it was unusual for Student.

76. On May 3, 2024, due to Student's recent frustration, Parents contacted the Districts and asked that they pause Student's reading intervention in the regular classroom with Fish for the remainder of the year, and the Districts obliged.

77. Fish expressed agreement with Parents' decision to remove Student from reading intervention. In an email to other staff, Fish wrote, "I agree with all of what you said. Too many people doing different things. This has been a concern of mine and Karen's from the beginning. I'm hoping SSD steps up next year and begins implementing research-based supports and not random things. Thanks for helping me out!"[20] Another Rockwood reading interventionist replied:

> Yes, agree with you both. [Student] needs a consistent, streamlined plan. His little mind cannot process and make sense of all the interventions.
>
> That being said (Lauren), you have done so much to support him this year! Trying to layer interventions actually does work for some students, so you had to try and be flexible which you totally were. You are an amazing RI teacher!
>
> Maybe there can be a meeting prior to school, so a strategic plan can be put in place. I would be happy to be included-just let me know.[21]

78. In the following days, Parents and staff for the Districts engaged in e-mail discussions about providing Wilson instruction for Student. Parents contacted SSD's special education coordinator, who stated she anticipated her staff were already familiar with Orton-Gillingham

---

[20] Pet. Ex. 59 at 1.
[21] *Id*.

teaching styles. Fairview's principal Lorinda Krey understood that Mother was looking for Student to receive Wilson instruction specifically, and confirmed that staff working with Student were versed in Orton-Gillingham. On May 8, 2024, Rockwood's special education administrator, Ellen Kenkel, recommended that Student receive Wilson in third grade, because they had tried LLI, Phonics First, and SIPPS without success.

79. Fairview did not have a Wilson instructor on staff, so they worked to coordinate how to provide Wilson to Student.

80. On May 9, 2024, Kenkel called Mother and told her that Student would receive Wilson instruction. Mother recalls being told that Student would receive instruction from a "certified" Wilson instructor.[22]

81. On May 10, 2024, Kenkel emailed District staff and informed them that Student's IEP would be amended with an increase to 150 minutes a week of reading instruction in the special education setting. She advised that Student will receive daily Wilson training from a special education teacher, and explained to Parents why the Districts would not be expressly using the name "Wilson" in the verbiage of the IEP. On the same day, the Districts issued a prior written notice that it would implement the increase in minutes.

82. Fish responded to Kenkel's email and advised that with the increase of minutes, Student should no longer receive the regular education reading intervention instruction, so they could focus on implementing the new program. Kenkel agreed and stated she had discussed this with Mother.

83. There are no formal requirements that prevent any person from implementing Wilson instruction. However, the Wilson program does offer a certification for instructors who have

---

[22] Tr. III at 102.

completed a three-day in-person training course, 90 hours of online training, and a one-year practicum teaching a student, with scheduled observations.

84. In their search for an instructor to provide Wilson training, the Districts considered internal options. The Districts first considered SSD teacher Samantha Branson. However, the Districts determined she was not a viable option, first, because she was waitlisted for Wilson and, second. after Branson was accepted for Wilson training, because Student did not meet the qualifications to be a practicum student because of his age and reading struggles. Accordingly, the Districts arranged for another teacher already trained in Wilson to provide Student's third grade instruction.

85. At the end of third grade, Student was recorded as reading at instructional level D – a marginal improvement from level C in first grade. Student showed he could sometimes segment sounds proficiently in words that had three sounds and was sometimes able to blend words in isolation smoothly and rapidly. However, he could not read passages. His handwriting remained very poor, and he continued to write with reversals, improper spacing, incorrect capitalization, poor legibility, and incorrect spelling. Meanwhile, other students with reading struggles who received SIPPS instruction made significant improvement. Student still had not mastered CVC words, and never reached a level where he was instructed on CVCE words like "cave" or "cake."

86. Student continued to receive private tutoring through Dyslexia St. Louis after the school year through June 13, 2024.

87. For his other subjects, Student could not read coursework on his own, so he received help from his teacher. For instance, Peterson would read word problems to Student in math class. In spite of his reading difficulties, Student performed well generally in other subjects and retained skills from day to day.

<u>Third Grade – 2024-2025</u>

88. On August 8, 2024, Branson emailed Kenkel and informed her that she had completed her 3-day Wilson training course and could implement Student's Wilson instruction, but she just could not use him as a practicum student for her certification. Initially, the Districts decided to continue with the previously-trained Wilson teacher, but after discussions with them about scheduling conflicts, they decided to have Branson provide Wilson instruction during third grade. Another student Branson provided instruction for at Fairfield would be her practicum student for the purposes of Wilson certification. Branson implemented Student's Wilson instruction with fidelity as she was trained. She took note of when Student was becoming frustrated and encouraged him with positive reinforcement.

89. Branson meticulously studied her Wilson materials and training. Branson worked one on one with Student. Simultaneously, she completed her required 90 hours of Wilson training and practicum with another Student. Per her training, she worked at a slower pace because of Student's significant reading struggles. While working separately with her practicum student, Branson underwent five observations from Wilson instructors. She received mostly positive feedback and incorporated feedback she received into her future lessons.

90. Student returned to Fairview for third grade. Effectively, Student entered third grade as a "non-reader."[23] His homeroom teacher was Sarah Jones. Branson implemented Student's 150 minutes of weekly special instruction in reading using Wilson. Student continued to receive occupational therapy as provided for in his IEP.

91. Throughout third grade, Student's reading achievement marginally improved and Student no longer tested in the bottom 1st percentile on STAR Reading Assessments. Student

---

[23] Tr. I at 204.

improved to the 2nd, 4th, and 2nd percentiles in the fall, winter, and spring, respectively. Although Student had improved incrementally, his scores indicated that he had continued to fall further behind his grade level as the year went on.

92. Conversely, Student performed very well on STAR Math Assessments. In December 2024, Student tested in the 82nd percentile. In April 2025, Student tested in the 99th percentile.

93. On August 27, 2024, Mother expressed disagreement with the decision not to utilize a Wilson certified instructor for Student's special education services. On August 28, 2024, Krey responded and stated that Branson was qualified to implement Wilson instruction by virtue of completing Wilson training in the summer.

94. On August 28, 2024, Mother sent an email to the Churchill Center and School (Churchill) in Town and Country, Missouri, to arrange a tour of their facilities. Churchill is a private placement that exclusively serves students with learning disabilities in reading, written expression, or math and children with executive functioning deficits like ADHD. Churchill's goal is to remediate students' skills and return them to a traditional classroom setting.

95. Parent continued to express disagreement with the decision to provide Student Wilson instruction with a teacher who was not fully certified. On August 30, 2024, Kenkel emailed Mother and stated that Branson:

> … will have a certified Wilson coach working directly with her to obtain her certification – this includes at least 5 fidelity observations and coaching sessions as well as every other month, she will attend our follow up cohorts to receive further instruction and support that aligns with where she is in teaching the program. She will also be completing a 90 hour online course with Wilson that again supports her with where she is teaching in the program in order to receive her certification so she will be getting lots of supports this year from the certified Wilson Coach and further training.[24]

---

[24] Pet. Ex. 107 at 6.

96. On September 6, 2024, Mother sent an email to Kenkel expressing concern that Student was not receiving enough Wilson instruction to maintain fidelity to the program. In Mother's understanding, Wilson required 180 minutes of weekly instruction, but Student was only receiving 150.

97. On September 11, 2024, the Districts amended Student's IEP to increase his special education instruction from 150 to 180 minutes per week.

98. In October 2024, the Districts recorded Student's progress on his IEP goals. For his basic reading goal 1, the Districts recorded:

> [Student] is able to decode an average of 16 out of 20 real and nonsense words accurately with the following patterns: CVC, CCVC, CVCC. These samples were taken from FastBridge decodable and nonsense word reading lists, as well as Wilson word reading lists from step 1.1 through 1.5. When broken down by the different samples [Student] has the following averages: FastBridge Decodable- 15/20, FastBridge nonsense: 14/20. Wilson word list real words- 17/20, Wilson word list nonsense words- 16/20.

For his basic reading goal #2, the Districts recorded:

> [Student] is able to read an average of 23 out of 30 given high frequency words. These samples were taken using Dolch primer sight words as well as the high frequency word lists from step 1.3, 1.4, and 1.5 in Wilson.

For his occupational therapy handwriting goal, the Districts recorded:

> [Student] is able to copy multiple sentences on bold lined paper with 3 reversals (S, #2, and #9) and 92% accuracy for legibility and 78% for line use (for a combined accuracy of 85%). He almost always reverses letter Ss, but is able to identify his error and fix it independently when prompted. He uses a reversal chart when completing written work.[25]

---

[25] Joint Ex. 134.

99. In December 2024, the Districts recorded Student's progress on his IEP goals. For his basic reading goal #1, the Districts recorded:

> [Student] is decoding an average of 12 out of 20 words accurately when given reading samples from FastBridge decodable and nonsense word reading, and Star CBM samples of expressive nonsense words. When broken down by each sample type he has the following accuracy rates: Fastbridge decodable- 14/20, Fastbridge nonsense- 12/20, and Star CBM nonsense- 11/20. [Student] is also assessed with decoding through Wilson, however these samples are taken out of 15 word samples so they are not taken in to this goal accuracy. He has the following accuracy rates for Wilson: Decodable 13/15 words, Nonsense words- 12/15 words.

For his basic reading goal #2, the Districts recorded:

> [Student] is reading an average of 17 out of 30 given high frequency words, using Wilson high frequency words for each step and Dolch primer sight words.

For his occupational therapy handwriting goal, the Districts recorded:

> [Student] is able to self-produce sentences on adapted highlighted paper with 90% accuracy for legibility and line use with an average of 3-5 reversals. He is able to near point copy sentences with 93% accuracy with an average of 3 reversals. He is able to independently fix reversals given one verbal cue and using a reversal checklist. Frequent reversals in OT are c, s, r, b, and f.[26]

100. By February 2025, Student was still only reading books at levels C and D, late kindergarten level.

101. In March 2025, the Districts recorded Student's progress on his IEP goals. For his basic reading goal #1, the Districts recorded:

> [Student] is able to decode an average of 14.5 out of 20 given words with the CVC pattern. These samples were taken with both real and nonsense CVC words. With Wilson word lists [Student] has an average of 12.5 out of 15 words correct, these were not

---

[26] Joint Ex. 134.

counted in the first average due to the word lists only containing 15 words and his goal being out of 20 words..

For his basic reading goal #2, the Districts recorded:

> [Student] is able to read an average of 30 out of 30 Wilson high frequency words from book 1 and 10 out of 30 given high frequency words from book 2.

For his occupational therapy handwriting goal, the Districts recorded:

> [Student] is able to near point copy a paragraph on yellow highlighted paper with 88% accuracy for legibility and 84% for line use. He demonstrates decreased spacing between words at 42%. He benefits from use of yellow highlighted paper in OT, but he said he did not want to use this in class. He continues to have up to 4 reversals on average, with "s" being a common reversal.[27]

102. On March 25, 2025, the District convened an IEP meeting. The IEP team discussed Students progress on his goals. Student was found ineligible for ESY services because he had not shown regression in his academic performance. After Mother expressed concern that Student may continue to advance from grade to grade without being able to read independently, the IEP team determined that Student required assistive technology. Mother expressed concern that she was not seeing Student's progress reflected at home. She brought writing samples showing Student's poor writing skills.

103. The IEP team created goals for Student that were substantially similar to prior IEP goals:

> Basic Reading Goal #1: By March 24,2026, when given a list of words with instructional level appropriate letter patterns CVC, CCVC, CVCC, and CVCE words (e.g.,can, trim, pond, hope), [Student] will increase his basic reading skills by identifying each sound in the word and blend the sounds together to correctly read the word aloud, with 85% accuracy on 3 out of 4 reading samples as measured by progress monitoring probes and oral reading samples.

---

[27] Joint Ex. 134.

> Basic Reading Goal #2: By March 24, 2026, when given a list of 30 priority, high-frequency words, [Student] will increase his basic reading skills by correctly reading the words aloud with fluency, for 20 out of 30 words as measured by progress monitoring samples and reading records.
>
> Fine Motor Goal: By 3/12/2026, given use of a visual checklist, assistive technology (i.e. keyboard, speech to text), and/or adapted paper, [Student] will produce written text with 80% accuracy for (1) spatial organization (spacing between words and letter size), (2) clear and distinguishable letter formation, and (3) will independently identify and correct reversals on 2/3 consecutive data days as measured by work samples.[28]

104.    On March 26, 2025, the Districts began the process of implementing assistive technology for Student.

105.    On April 7, 2025, the Districts created an assistive technology plan for Student. The plan called for a trial period of various assistive technologies including Read Write Google, Co:Writer, and a CPen for Student.

106.    CPen is an apparatus that reads words as it is scanned over text like a highlighter. Student wears headphones while using it in the classroom. Read Write Google is a Chrome browser extension that reads passages aloud to Student.

107.    Student responded well to assistive technology. Student's initial impressions of the CPen were positive, and Mother reported it worked well. Student's teachers reported similar success, but noted Student had become less interested in it than when he first received it and uses the tool about 50% of the time in class. Likewise, Student responded well to Co:Writer and frequently used it for voice typing. Student did not have many opportunities to use Read Write Google at the end of third grade.

---

[28] Joint Ex. 138 at 7-8.

108.    On May 1, 2025, Student attempted a grade level reading comprehension exercise with a passage read to him by his teacher. He struggled to summarize the passage and correctly answered 4-5 out of 9 questions.

109.    On May 13, 2025, the Districts convened a RED meeting to determine what additional services Student may require. District staff explained that ESY services were not being offered because Student had not shown regression. Parents, through counsel, questioned this logic by noting that Student had not made any significant progress to regress from. Parents requested a private placement at Churchill, which the Districts rejected because it was not a DESE approved placement. The District proposed to amend Student's IEP to provide an encoding goal, but Parents expressed no opinion and stated they would defer to the Districts' staff for that determination.

110.    Following the meeting, the District implemented a new IEP for Student. The IEP remained substantially the same as Student's March 2025 IEP, but included a new basic reading goal targeted toward encoding and increased Student's special education instruction from 180 minutes to 240 minutes.

111.    At Parents request, Justin Schwartzman, a tutorial supervisor and Wilson-partnered trainer at Churchill, reviewed Branson's documentation from her instruction with Student. Schwartzman expressed mild concern with some of Branson's Wilson materials. Specifically, he felt most concerned Student may have progressed too quickly from lessons 1.3 to 1.5. Lesser concerns included letter reversals on Wilson worksheets, observations in Student's work that he would suggest targeting in later lessons, and sight word reading and spelling that he felt could have been "a little more solid."[29]

---

[29] Tr. II at 174.

<u>Churchill – Summer 2025</u>

112.    On May 14, 2025, Parents filed a due process complaint alleging multiple violations of the IDEA and seeking a private placement at Churchill. Subsequently, Parents removed Student from the Districts, and enrolled Student in Churchill's summer school program.

113.    Student attended Churchill from 8:20 to 2:20 daily between June 9, 2025, and July 18, 2025. During this time he received Wilson instruction from a Wilson certified instructor for 45 minutes daily. Churchill's summer program cost Parent's $7,300 for tuition.

114.    At the end of his summer instruction, Student made no significant progress in reading or writing. Student began his instruction at Churchill at Wilson level 1.3 and failed to complete it during his six weeks of instruction.

115.    Parent enrolled Student at Churchill for the 2025-2026 school year. Tuition for the school year is $39,950.

116.    Should Student return to Fairview, he would receive Wilson instruction from Branson, who has now completed her Wilson certification, at the levels specified by his IEP or greater, should the IEP team determine more intervention is necessary.

**Conclusions of Law**

This Commission has authority to hear this case. Section 162.961.[30] The burden of proof is on the party seeking relief: in this case, Parents. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). They must prove their case by a preponderance of the evidence, *Tate v. Dep't of Soc. Servs.*, 18 S.W.3d 3, 8 (Mo. App. E.D. 2000), which is "evidence which as a whole shows the fact to be proved [is] more probable than not." *State Bd. of Nursing v. Berry*, 32 S.W.3d 638, 642 (Mo. App. W.D. 2000) (internal citations omitted).

---

[30] Citations are to RSMo 2016 unless otherwise indicated.

We must judge the credibility of witnesses, as well as the weight and value of the evidence. *Faenger v. Petty*, 441 S.W.3d 199, 204 (Mo. App. W.D. 2014). We have the discretion to believe all, part, or none of the testimony of any witness. *Dorman v. State Bd. of Regis'n for the Healing Arts*, 62 S.W.3d 446, 455 (Mo. App. W.D. 2001). When there is a direct conflict in the testimony, we must make a choice between the conflicting testimonies. *Harrington v. Smarr*, 844 S.W.2d 16, 19 (Mo. App. W.D. 1992). Our findings of fact reflect our credibility determinations.

In their complaint, Parents allege that the Districts: 1) denied Student a FAPE by failing to provide Student appropriate special education and related services to meet his unique needs and that are reasonably calculated to provide a meaningful educational benefit and make progress in light of his circumstances; 2) failed to conduct a comprehensive evaluation in all areas of suspected disability; 3) failed to follow the parental safeguards to enable Parents to meaningfully participate in the IEP meetings; 4) failed to provide necessary services, including specially designed instruction based on peer-reviewed research, ESY services, assistive technology, tutoring services, supplementary aids and services in all areas of need over the course of years and failed to make needed adjustments when Student displayed a lack of meaningful progress; 5) failed to provide appropriate goals; 6) failed to implement his IEP as written by failing to provide specialized educational instruction to enable him to make progress on his goals and failing to take proper data on goals; and 7) failed to ensure all staff members providing services and instruction to the student were properly trained and licensed to provide special education services to Student.

In their brief, Parents restate and combine these allegations in a different manner. Parents contend that the Districts 1) violated their child find obligations; 2) failed to provide an IEP that

confers an educational benefit; 3) committed "procedural violations"[31] of the IDEA relating to

Parents' right to an IEE and parent participation; 4) failed to implement Student's IEP with

fidelity; 5) failed to implement specific interventions with fidelity; and 6) failed to provide

necessary ESY services. For simplicity and to reflect Parents' most recent understanding of the

issues of the case, we address their positions as stated in their brief.

<u>Evidentiary Issues</u>

We took several objections with the case. The Districts objected to background questions

during Buffington's testimony on the basis that they called for information outside the IDEA's

two-year statute of limitations. Those objections are overruled.

Parents objected to questions to Kenkel calling for her recollection of statements made

by Mother during an IEP meeting on the basis of hearsay. Those objections are overruled.

Mother's statements fall under the hearsay exception for admission by a party opponent.

Parents moved to strike Respondents' Exhibits 161-164. Parents suggested at the hearing

the exhibits were improperly admitted under the belief that Respondents' Exhibit 165

represented their source data. Our review of the record revealed no issues with the foundation

laid for these exhibits. Parents' motion to strike is denied.

Parents asked us to take judicial notice of Petitioners' Exhibit 189-224. Parents' attorney

represented that she had pulled the exhibits from SSD's website herself. Parents offered no legal

basis under which we could take notice of the exhibits and laid no foundation for their

admissibility. Parents' request to take notice of Petitioners' Exhibits 189-224 is denied.

Parents moved to re-open the record to admit Respondents' Exhibit 22 – a document

titled "Kayla Meyer February 2024 Attendance." At the close of the hearing, Parents realized

---

[31] We use the term "procedural violations" in sections to match Parents' presentation of their claims for relief. As described in our conclusions of law, other violations Parents allege like child find are also procedural violations.

they forgot to offer the exhibit into evidence when it was discussed with Kenkel the day before. Parents offered Respondents' Exhibit 22, and Respondents objected to the foundation for the exhibit. We sustained Respondents' objection. Upon reconsideration and with the benefit of a written transcript of Kenkel's testimony, we find that sufficient foundation was laid to admit the exhibit pursuant to § 536.070(10), grant Parents' motion, and admit Respondents' Exhibit 22.

Parents objected to the admission of Respondents' Exhibit 121, Mother's deposition, on the basis of hearsay, which we overruled. After a break, Parents argued against the admission of Exhibit 121 and requested the opportunity to provide line-by-line objections to Mother's deposition testimony and brief the issue, which we granted. Upon review of the filings of Parents and the Districts, we stand by the admission of Exhibit 121 into evidence and will give it the weight it deserves as reflected in our findings of fact. Mother had previously testified under oath for several hours at her deposition where she was represented by the same counsel as in this case. If the Districts were to ask Mother the same questions at the hearing, it would have been an inefficient use of time.

## The IDEA Framework

Under the IDEA, all children with disabilities are entitled to a FAPE designed to meet their unique needs and to prepare them for further education, employment, and independent living. 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.1(a). The Missouri State Plan for Special Education (July 30, 2023) (State Plan) generally defines a FAPE as regular and specialized special education[32] and related services, including preschool through secondary education, which are provided at public expense, under public supervision and direction, and in conformity with the student's IEP, and which meet the state educational agency's standards for educating disabled

---

[32] Special education is "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability[.]" 32 C.F.R. § 300.39(a)(1).

students. State Plan, Reg. I, § G at 6-7. When a student is identified as eligible under the IDEA for special education and related services, an IEP team comprised of relevant school personnel and parents designs an IEP "reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances*." Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

### Child Find

The IDEA requires each state's department of education to actively identify, locate, and evaluate children with disabilities. 20 U.S.C. § 1412(a)(3)(A). This duty extends to "[c]hildren who are suspected of being a child with a disability under § 300.8 and in need of special education, even though they are advancing from grade to grade[.]" 34 C.F.R. § 300.111(c)(1). When a child is identified as "potentially having a disability, the child's District 'shall conduct a full and individual evaluation' to determine whether the child has a disability*." Independent Sch. Dist. No. 413 v. H.M.J., ex rel. A.J., M.N.*, 123 F. Supp. 3d 1100, 1108 (D. Minn. 2015), quoting 20 U.S.C. § 1414(a)(1)(A). Failure to comply with the child find requirement is a procedural violation of the IDEA. *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 138 (3d Cir. 2022). A procedural violation is only redressable if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits. *Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S.*, 641 F.3d 996, 1005 (8th Cir. 2011), quoting 20 U.S.C. § 1414(d)(3)(A)(ii), (d)(4)(A)(ii)(III).

Parents allege that although the Districts found Student eligible for special education services as a child with a disability in first grade, the Districts failed to consider and find Student eligible for a SLD under other bases like reading comprehension, reading fluency, and written expression. Additionally, Parents alleged the Districts failed to consider other areas of eligibility in "occupational therapy" and speech. We address these positions in turn.

*Specific Learning Disability*

Early in his education, the Districts identified Student as a child with a disability under the category of SLD. Specifically, the Districts found he had a SLD due to deficiencies in basic reading. However, there are other ways a child might be found to have an SLD. The State Plan defines SLD as:

> a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations. The term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. The term does not include learning problems that are primarily the result of a visual, hearing, or motor disability; intellectual disability; emotional disturbance; cultural factors; environmental or economic disadvantage; or, limited English proficiency.

> A student has a specific learning disability when:

> (1) The student does not achieve adequately for the student's age or to meet state approved grade-level standards in one or more of the following areas, when provided with learning experiences and instruction appropriate for the student's age or state approved grade-level standards:

> a. Oral Expression
> b. Listening Comprehension
> c. **Written Expression**
> d. Basic Reading Skill
> e. **Reading Fluency Skills**
> f. **Reading Comprehension**
> g. Mathematics Calculation; and,
> h. Mathematics Problem Solving

> (2) The student does not make sufficient progress to meet age or state approved grade-level standards in one or more of the areas identified above when using a process based on the student's response to scientific, research-based intervention; or the student exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, state approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning

36

disability, using appropriate assessments, consistent with 34 CFR 300.307-300.311. A pattern of strengths and weaknesses is defined as a severe discrepancy between achievement and intellectual ability of at least 1.5 standard deviations; and,

(3) The group determines that its findings under this section are not primarily the result of:

    a.  A visual, hearing, or motor disability;
    b.  Intellectual disability;
    c.  Emotional disturbance;
    d.  Cultural factors;
    e.  Environmental or economic disadvantage;
    f.  Limited English Proficiency;
    g.  Lack of appropriate instruction in reading, including the essential components of comprehensive literacy instruction (as defined in section 2221(b)(1) of the ESEA);
    h.  Lack of appropriate instruction in math; and

(4) To ensure that underachievement in a student suspected of having a specific learning disability is not due to lack of appropriate instruction in reading or math, the group must consider, as part of the evaluation:

    a.  Data that demonstrate that prior to or as part of the referral process, the student was provided appropriate instruction in regular education settings, delivered by qualified personnel, and
    b.  Data-based documentation of repeated assessments of achievement at reasonable intervals, reflecting formal assessment of student progress during instruction, which was provided to the student's parents.

State Plan, Reg. III, § B at 28-29 (emphasis added).

Neither the State Plan nor the IDEA defines "Basic Reading Skills," "Reading Comprehension," "Written Expression," nor "Reading Fluency Skills." Case law construing these terms instructs us to apply the common meaning of these words. *H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 451 (D.N.J. 2011). We understand from the record and common understanding that reading "fluency" involves the speed and accuracy of reading and "comprehension" involves retaining an understanding of the subject matter of

written language. We understand "written expression" to relate to a student's ability to express themselves through writing. Likewise, we understand "basic" reading as the fundamental skills necessary to read fluently and for comprehension.

The record reflects that Student has profound difficulties in reading and writing. He has made effectively no progress toward independent reading and writing despite multiple interventions and progressively increasing service minutes and accommodations. The record paints a picture of a student who has not yet grasped the foundational elements of reading like segmenting the sounds of letters and blending them together to form words. Unsurprisingly, Student cannot comprehend passages, write, or read fluently words he cannot read.

The Districts recognized this and considered other areas of eligibility, but correctly decided that Student's struggles were caused by a fundamental inability to read words. Metro East reached essentially the same conclusion, writing it "cannot reliably measure [Student's] reading comprehension skills as much of his cognitive stamina is being reserved to accurately decode words, and, because this skill is so rigorous for him, he resorts to reading graphic/phonemically with little regard for context or meaning."[33]

Furthermore, even if Student's IEP should have specified SLD in other areas, there is no evidence to suggest that omission resulted in a loss of educational opportunity or benefits. Because the IDEA requires highly particularized special education services, the specific "disability diagnosis" a child receives is "substantively immaterial because the IEP will be tailored to the child's specific needs." *Fort Osage*, 641 at 1004. So long as an IEP is reasonably calculated to provide an opportunity for a student to make appropriate progress in light of their circumstances, their specific disability diagnosis is immaterial to a FAPE. *Minnetonka Pub. Sch.,*

---

[33] Pet. Ex. 33 at 12.

*Indep. Sch. Dist. No. 276 v. M.L.K. by & through S.K.*, 42 F.4th 847, 853 (8th Cir. 2022). In *Minnetonka*, the Eighth Circuit found that a school district did not deny a FAPE to a student who was found eligible under the category of autism spectrum disorder but not under other categories related to his medical diagnoses of dyslexia and ADHD. The court found the district did not deny student a FAPE, "even if [his] disability was misclassified[.]" *Id*. As support for its conclusion, the court noted that although student's IEP goals had remained largely the same, the district had tried new curricula and intervention strategies while increasing minutes in response to the student's struggles. *Id.*

Like the district in *Minnetonka*, the Districts have consistently offered new, increasing interventions to address Student's struggles. Parents offered no evidence to suggest how other specific diagnoses would have resulted in instruction different from that which Student was already receiving. Parents offered evidence suggesting that Orton-Gillingham based interventions represent the most appropriate interventions for Student's reading and writing needs. However, Student was already receiving Orton-Gillingham based private tutoring in second grade to little effect, and Student received Wilson instruction throughout third grade. Petitioners failed to establish that other interventions used by the Districts were not reasonably calculated to enable Student to read and, eventually, write and read with fluency and comprehension. The record also expressly reflects that Wilson specifically addresses these ancillary reading skills. Although Metro East did find that Student demonstrated problems with written expression, the Districts implemented goals and IEP provisions to address his handwriting through occupational therapy. Under the facts before us, we cannot discern how expressly diagnosing Student with an SLD under other subcategories would have any impact on his reading or writing performance.

*Occupational Therapy*

Parents' discussion of occupational therapy as a child-find violation is misplaced, because "occupational therapy" is not a category of eligibility for services under the IDEA. *See* 20 U.S.C. § 1401(3)(A)(i); State Plan, Reg. III, § B. Although not strictly related to child find, per se, Parents argue the Districts denied Student a FAPE by failing to evaluate Student for occupational therapy services. Depending on the specific needs of a student, occupational therapy may be necessary to provide a FAPE. *See D. L. by Landon v. St. Louis City Sch. Dist.*, 950 F.3d 1057, 1064 (8th Cir. 2020) (district denied student with autism a FAPE, in part, by failing to provide direct occupational therapy services).

The record reflects the District had previously conducted an occupational therapy evaluation and found no deficits in visual or fine motor skills. Student began receiving occupational therapy in the second semester of first grade, shortly after his handwriting struggles with letter reversals and line adherence were no longer age appropriate. We find the Districts did not deny Student a FAPE with respect to occupational therapy.

*Speech*

Parents argue the Districts violated child find by failing to provide speech services. Although not specified by Parents in their brief, a Speech or Language Impairment (SLI) is a category of disability recognized by the IDEA. *See* 20 U.S.C. § 1401(3)(A)(i). For a student to qualify for an SLI diagnosis, they must, as a threshold, have "a communication disorder, such as stuttering, impaired articulation, language impairment, or voice impairment that adversely affects a student's educational performance." State Plan, Reg. III, § B at 29.

Parents showed no evidence that Student had a speech impairment that adversely affected his educational performance. Student did receive speech-related services for only his /r/ sound. No evidence suggests that slight impairment affected his educational performance. To the

contrary, his teachers described his verbal communication as adept, and Mother stated Student did not have a huge speech deficit. We find the Districts did not violate their child-find obligations by failing to diagnose Student with a SLI.

Educational Benefit

Parents' second briefed point focuses on the heart of this case: Student's failure to make any more than minimal progress in reading throughout his education. Unquestionably, Student has not made any meaningful progress towards independent reading and writing. However, the IDEA "cannot and does not promise "any particular [educational] outcome." *Endrew F.*, 580 U.S. at 398, citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 192 (1982). The question before us is whether the Districts designed an IEP "reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances*." Endrew F.*, 580 U.S. at 399.

Throughout their complaint and written arguments, Parents express comprehensive disagreement with essentially every facet of Student's education. As such, it is difficult to summarize their position with respect to this particular allegation. As expressed in their brief, Parents base this allegation on the Districts' failure to target fluency, reading comprehension, and writing; a failure to address CVCE words; a failure to address phonological awareness; and a practice of setting goals that were inappropriately low. These specific arguments lack merit.

As we previously stated, we find no significance to the Districts' failure to specifically name reading comprehension, fluency, or written expression in Student's IEPs. Student's problems in those area stem from fundamental, or "basic," reading and writing problems that are currently targeted through the Districts' basic reading and occupational therapy goals. It makes sense that Student did not receive instruction on CVCE words when he still struggled to master basic CVC words. Likewise, it makes little sense to argue that Student's IEP goals were not

41

ambitious enough, when he failed to meet the rudimentary goals the Districts had set for him. Parents' argument regarding a lack of phonological awareness instruction lacks merit. Both Phonics First and SIPPS target phonemic awareness, and noo evidence suggested that Wilson, Parents' preferred intervention for Student, does not.

From a broader perspective, we find that the Districts did implement IEPs reasonably calculated to enable Student to make progress in light of his circumstances. Absent an evidentiary basis to the contrary, we must extend deference to the Districts' selection of education programming for Student. *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 24 (1st Cir. 2008) ("Judges are not trained pedagogues, and they must accord deference to the state agency's application of its specialized knowledge"). An IEP represents a "'snapshot, not a retrospective,'" and must be judged based on what was "'objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated.'" *K.E. v. Ind. Sch. Dist.*, 647 F.3d 795, 808 (8th Cir. 2011) (internal citation omitted). Because an IEP "'is not guaranteed to produce any particular outcome,' . . . 'the measure and adequacy of an IEP can only be determined as of the time it is offered to the student.'" *Alex. W. v. Poudre Sch. Dist. R-1*, 94 F.4th 1176, 1189 (10th Cir. 2024) (internal citations omitted). The actual progress a student makes is not dispositive of whether the IEP was reasonably calculated to allow for appropriate progress at the time it was created. *Id.,* quoting *Endrew F.*, 580 U.S. at 399 ("The 'question is whether [an] IEP is *reasonable*, not whether the court regards it as ideal.'"); *see also Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 424 (8th Cir. 2010).

Student clearly has not made any significant progression towards reading or writing, but the Districts have not stood idly by and allowed that to happen. When Student failed to progress with LLI, the Districts switched to Phonics First, then SIPPS, and ultimately Wilson. The Districts progressively increased Student's service minutes, added occupational therapy to

address writing concerns, and implemented assistive technology. The Districts never offered Student less than the 60 minutes of weekly instruction recommended by Metro East. The Districts specifically offered the Wilson training requested by Parents, and no evidence suggested that the other interventions the Districts previously tried were not highly structured, research-based, or otherwise reasonably calculated to provide Student with an educational benefit.

<u>Procedural Violations Part 1: Independent Educational Evaluation</u>

Parents argue the Districts violated their right to obtain an IEE for Student pursuant to 20 U.S.C. § 1415(b)(1), because (1) Rockwood staff disagreed with SSD's evaluation and suggested Parents seek testing without informing them of their right to request one, and (2) the Districts failed to consider the results of the evaluation they procured from Metro East. Federal regulation 34 C.F.R. § 300.502 provides:

(a) General.

(1) The parents of a child with a disability have the right under this part to obtain an independent educational evaluation of the child, subject to paragraphs (b) through (e) of this section.

(2) Each public agency must provide to parents, **upon request for an independent educational evaluation**, information about where an independent educational evaluation may be obtained, and the agency criteria applicable for independent educational evaluations as set forth in paragraph (e) of this section.

(3) For the purposes of this subpart—

(i) Independent educational evaluation means an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question; and

(ii) Public expense means that the public agency either pays for the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent, consistent with § 300.103.

(b) Parent right to evaluation at public expense.

(1) A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency, subject to the conditions in paragraphs (b)(2) through (4) of this section.

(2) **If a parent requests an independent educational evaluation at public expense**, the public agency must, without unnecessary delay, either—

(i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or

(ii) Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria.

(3) If the public agency files a due process complaint notice to request a hearing and the final decision is that the agency's evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense.

(4) If a parent requests an independent educational evaluation, the public agency may ask for the parent's reason why he or she objects to the public evaluation. However, the public agency may not require the parent to provide an explanation and may not unreasonably delay either providing the independent educational evaluation at public expense or filing a due process complaint to request a due process hearing to defend the public evaluation.

(5) A parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an evaluation with which the parent disagrees.

(Emphasis added).

Parents' right to an IEE hinges on making a request for one, and Parents never made that request. Fish did not disagree with SSD's evaluation nor ask Mother to get an evaluation, but simply suggested that dyslexia testing might be helpful and cautioned that it might not require a change of services. Fish – a reading intervention teacher – was understandably unfamiliar with

the procedures for requesting an IEE, and no law obligated her to provide that information. The Districts did provide Parents notice of the IDEA's procedural safeguards including when it implemented Student's initial IEP.

With respect to the Districts' consideration of the Metro East evaluation, Parents point to the fact that the Districts did not include data points from the report in Student's IEPs. We do not find this fact indicative of a failure to consider Metro East's evaluation. The most critical findings and recommendations from the independent report were already discovered in Student's initial evaluation or subsequently addressed through his IEP. Student was already receiving significantly more than the 60 minutes of reading instruction recommended by Metro East, and the Districts had already implemented an IEP for basic reading. Metro East also recommended writing interventions geared at fine motor skills, and noted that it was a common mistake not to address written expression simultaneously with basic reading. Metro East suggested a second opinion targeted at his handwriting skills. Student's initial IEP did not target his writing deficits, but the Districts did revisit his handwriting through an occupational therapy evaluation. After initially finding supports for handwriting were not necessary, the Districts addressed Student's writing through occupational therapy in an amendment to Student's IEP less than two months after receiving the Metro East report. At Student's next annual IEP meeting in April 2024, the IEP team discussed Student's dyslexia diagnosis. It appears from these facts that the Districts did consider the private evaluation results. We find no violation of 34 C.F.R. § 300.502.

<u>Procedural Violations Part 2: Parental Participation.</u>

The IDEA contains a procedural right for parents to participate fully in developing a proper IEP. We may find that the Districts denied Student a FAPE if the Districts "significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE] to the parents' child[.]" 20 U.S.C. § 1415(f)(3)(E)(ii)(II). Parents argue

45

the Districts denied Parents the right to participate in developing Student's IEP in four respects, which we address in turn.

Parents allege the Districts concealed the extent of Student's struggles from Parents. As evidence, Parents essentially restate their comprehensive disagreement with every component of Student's education including issues addressed elsewhere in this decision (ESY, phonemic awareness interventions, speech concerns, the sufficiency of Student's reading interventions, fidelity to Wilson, etc.). Only a few points relate uniquely to Parents' participation. Specifically, Parents point to (1) the typo and omission of one data point in a slide presentation in May 2023, (2) Fish's failure to tell Parents about her concerns for Student or her impressions about the severity of his dyslexia, and (3) isolated phrasing used in documents relating to Student's performance like "emerging" on report cards the verbiage "*grown* into level D" – which Parents claim illustrate misstatements of Student's actual progress.[34] Generally, Parents allege the Districts withheld raw data from tests and coursework from them.

We find Parents' concerns on these matters significantly overstated. As reflected in Student's STAR Reading Assessments, which Parents admit receiving, Student has always profoundly struggled in reading. We do not believe Parents were actually deceived into believing their son was not significantly struggling because of a typo they likely never noticed until commencing this litigation, or euphemistic grading language like "emerging." Although Fish did not express the exact verbiage "major concerns" or "most severe" to Parents, she did communicate with them about Student's struggles and even suggested they consider further testing. Fish also frequently consulted with Mother about Student's reading performance. The fact that the Districts did not provide every piece of classwork or raw data does not support the

---

[34] Joint Ex. 43.

contention that the Districts withheld information from Parents. There is no evidence that any requests for such information was denied such as would support a finding of a procedural violation. *See* 34 C.F.R. § 300.613. To the contrary, the record illustrates that Parents did have access to Student's classroom work as evinced by writing samples they brought to IEP meetings.

Additionally, the record is replete with evidence that Parents were active, effective participants in Student's special education. When Parents disagreed with the Districts' initial denial of occupational therapy services, Districts' staff remembered those concerns and worked to coordinate those services. The Districts went to considerable lengths to provide Wilson instruction as Parents requested. When Parents suggested Student should receive 180 minutes instead of 150 minutes of Wilson instruction, the Districts promptly acquiesced. Finally, when Parents requested assistive technology, the Districts made a plan to implement it, and Student now utilizes assistive technology. We find that the Districts did not deny Parents the opportunity to participate in Student's special education.

Failure to Implement IEPs with Fidelity

Parents argue the Districts denied Student a FAPE by failing to implement his IEP as written. Specifically, Parents allege the District never provided required special education minutes allotted by his IEP in second grade when Meyer was instructing him. The only facts Parents present to support this claim rest in an incomplete service log of Meyer's service minutes in February of 2024 and the fact Meyer did not maintain her raw instruction data. Neither of these facts demonstrate to us that Meyer did not actually provide services required under the IEP.

Parents chose not to call Meyer to testify about this critical component of their case, and instead belabored other concerns with largely duplicative testimony. Since Meyer was not called, and Parents did not plead this highly significant allegation with any specificity in their complaint, the Districts did not have an opportunity to rebut Parents' claim. However,

Rockwood's special education coordinator did testify that Meyer was providing research-based special education interventions targeted towards Student's IEP. Based on the record before us, Meyer provided basic reading instruction with fidelity in Student's IEP.

<u>Failure to Implement Wilson with Fidelity</u>

Parents argue the Districts denied Student a FAPE by failing to implement Student's reading intervention programs with fidelity. Specifically, Parents allege Branson failed to correctly implement Wilson in various respects, and, confusingly, they argue that Meyer previously failed to implement a program they contend was not actually a specific reading program at all.

As discussed above, the record reflects that Meyer utilized research-based interventions. Parents presented no evidence that these interventions required training that Meyer lacked or that she otherwise implemented them without fidelity. Parents' criticisms about her failure to maintain data are valid. But as we discuss below, we are confident that Student's struggles to read are not the result of a failure to implement programs with fidelity.

The District established that Branson was trained and qualified to provide Student Wilson instruction. Student's ineligibility as a practicum student did not mean Student was not suited to be taught by her. It only means that Student did not suit the standards for completing a year-long practicum for certification. We do not believe that Branson's lack of certification adversely impacted her instruction. Branson is an experienced and competent special education teacher. After completing her training to begin her Wilson practicum, Branson worked simultaneously with another student who progressed at a more typical rate than Student, allowing Branson to work ahead on later lessons before they would be implemented with Student. She completed her observations, received coaching, and received and implemented feedback on her instruction. Concurrently, she completed a 90-hour instruction course. Parents' witness Schwartzman

expressed only mild criticisms of Branson's work. But those facts present only a small component of why any alleged lack of fidelity to programming is not the cause of Student's struggles.

The clearest fact from the record is that Student is profoundly dyslexic and, to some extent, dysgraphic.[35] Despite significant cognitive ability, Student has failed to respond to multiple reading interventions. The record suggests that Student may unfortunately have been progressing at the limit of his capabilities during this time. Metro East specifically recommended programs *like* Orton-Gillingham, Mother testified Orton-Gillingham was the "gold standard" for dyslexia, and Parents' position now is that Wilson – another Orton-Gillingham program – represents Student's best chance at independent reading. The problem with Parents' position is that Student has received Orton-Gillingham based instruction before and after working with Branson. Student received private Orton-Gillingham tutoring in second grade. Student received Wilson in third grade and in the summer. Despite this, Student still showed no meaningful progress in reading. These facts appear to apply equally to dysgraphia. Parents presented no evidence regarding appropriate interventions for dysgraphia specifically, except for the implicit argument that services they sought, and already provided by the Districts, like Wilson and occupational therapy, represent effective interventions.

Based on the record before us, it appears possible that Student is profoundly impaired by dyslexia and dysgraphia and may always struggle to read and write at grade level.[36] We believe that Student, despite these difficulties, can and will read, write, and succeed in school. But there are glaring omissions in the record that preclude us from finding the Districts denied Student a

---

[35] Parents provided no evidence about what "dysgraphia" actually is. We infer from context that it relates to difficulty with writing.
[36] An IEP is not required to target grade level performance if it is not a reasonable expectation for a student. *Endrew F.*, 580 U.S. at 387-88.

FAPE. Parents presented no evidence about fundamental concepts about what dyslexia or dysgraphia really are, how they affect reading and writing, how they may manifest in a student's work, or how they can be ameliorated. Parents presented no evidence concerning how Orton-Gillingham or Wilson differentiates from other programs Student received like LLI, Phonics First, the Florida Center for Reading Research, or SIPPS. In short, Student's struggles appear to stem from his unique circumstances rather than a lack of fidelity to interventions.

Extended School Year Services

Under the IDEA, ESY services "must be provided *only if* a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child." 34 C.F.R. § 300.106(b) (emphasis added). However, ESY services represent a possible substantive component of a FAPE depending on the unique needs of the Student. *See Cordrey v. Euckert*, 917 F.2d 1460, 1470 (6th Cir. 1990). For instance, a child with a disability who is likely to experience significant educational regression over a school break would require ESY. *Id*. The plurality of federal courts focus solely on regression in their consideration of ESY services. *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014) ("If a disabled child needs ESY services in order to prevent substantial regression, that child's ESY placement is an integral part of his or her twelve-month educational program"); *MM ex rel. DM v. Sch. Dist. of Greenville Cnty*., 303 F.3d 523, 537 (4th Cir. 2002) ("ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized"). Absent "hard empirical proof" of regression, expert testimony is necessary to establish a likelihood of regression. *Cordrey v. Euckert*, 917 F.2d 1460, 1472 (6th Cir. 1990).

Student's IEP team determined he did not require ESY, so he is not eligible for it. *See* 34 C.F.R. 300.106(b). We lack an evidentiary basis to find Student required ESY for a FAPE. The

only evidence in the record that suggested a need for ESY services comes from the fact that Student was found eligible for ESY in January 2024 and subsequently found ineligible in April 2024. Neither party presented evidence explaining the decision to find Student eligible for ESY, however the IEP team considered Student's recent STAR testing scores on both occasions. Student had shown regression in math achievements scores at this time (scoring in the 36th and 82nd percentiles – down from the 99th percentile the prior Spring. Accommodations aimed at his struggle to read test problems, Student no longer showed signs of regression in math (with a STAR math score in the 97th percentile) prior to being determined ineligible for ESY in Spring 2024. The record contains no empirical proof of his regression. Instead, Student stagnated or, at best, marginally progressed. Parents presented no expert testimony to show that Student would regress without ESY. We find no violation of the IDEA for failure to provide ESY services.

**Summary**

We find the Districts did not violate the IDEA. Parents failed to demonstrate the Districts' denied Student a FAPE, violated procedural safeguards for parent participation or IEEs, failed to implement his IEP or interventions with fidelity, or that Student required ESY services.

SO ORDERED on September 30, 2025.

_Spencer Bartlett_
SPENCER BARTLETT
Commissioner

51

## Appeal Procedure

Please take notice that this is a final decision of the Administrative Hearing Commission and you have a right to request review of this decision. Per § 162.962 of the Revised Statutes of Missouri, when a review of this decision is sought, either party may appeal as follows:

(1) The court shall hear the case without a jury and shall:

    (a)  Receive the records of the administrative proceedings;

    (b)  Hear additional evidence at the request of a party; and

    (c)  Grant the relief that the court determines to be appropriate, basing its decision on the preponderance of the evidence.

(2) Appeals may be taken from the judgment of the court as in other civil cases.

(3) Judicial review of the Administrative Hearing Commission's decision may be instituted by filing a petition in a state or federal court of competent jurisdiction. Appeals to state court shall be filed within 45 days after the receipt of the notice of the agency's final decision.

(4) Except when provided otherwise within this chapter or Part 300 of Title 34 of the Code of Federal Regulations, the provisions of chapter 536 are applicable to special education due process hearings and appeal of same.

(5) When a commissioner renders a final decision, such decision shall not be amended or modified by the commissioner or administrative hearing commission.

The right to appeal is also addressed in 34 C.F.R. § 300.516.